IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,                )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )
                                          )        No. 3:19-CR-191-TAV-HBG
CEDRIC BROWN,                             )
                                          )
                    Defendants.           )

## REPORT AND RECOMMENDATION

This case is before the Court, for report and recommendation, on the Defendants' Motion

to Suppress [Doc. 34].  *See* 28 U.S.C. § 636(b).  On July 2, 2019, Trooper Ryan Fletcher of the

Tennessee Highway Patrol ("THP") stopped a gray Chrysler sedan driven by Defendant Cedric

Brown, for following too closely and speeding.  Upon approaching the open window of the vehicle,

Trooper Fletcher noticed the odor of marijuana.  Law enforcement subsequently searched the car

and seized illegal drugs and a gun.  Defendant asks the Court to suppress all evidence seized in the

search of the vehicle, arguing the trooper lacked reasonable suspicion of a traffic violation to

conduct the stop, lacked probable cause to search the car, and unreasonably extended the traffic

stop in both scope and duration.  For the reasons discussed herein, the Court finds the stop and

search of the Defendant's car comports with the Fourth Amendment.  However, the Court finds

the unwarned questioning of Defendant inside a patrol car violates the Fifth Amendment.

Accordingly, the undersigned respectfully recommends that the Motion to Suppress be granted in

part, in that his statements inside the patrol car be suppressed, and denied in all other respects.

## I.    POSTIONS OF THE PARTIES

This case arises out of the July 2, 2019 stop and search of a Chrysler sedan, driven by Defendant Brown.  Based upon evidence seized from the car on that day, Defendant is charged with possession with intent to distribute heroin (Count One), possession with intent to distribute cocaine base (Count Two), possession of a firearm in furtherance of drug trafficking (Count Three), and being a felon in possession of a firearm (Count Four) [Doc. 1].

The Defendant asks [Doc. 34] the Court to suppress all evidence gained from the July 2, 2019 traffic stop, arguing law enforcement's actions violated his rights under the Fourth Amendment.  He contends the traffic stop was an unconstitutional seizure because Trooper Fletcher lacked probable cause or reasonable suspicion to believe he was speeding or following too closely for the weather and traffic conditions.  Second, Defendant asserts that Trooper Fletcher lacked probable cause to search his vehicle pursuant to the automobile exception, because the evidence does not support his claim that he detected the odor of marijuana.  Alternatively, he argues that law enforcement could not search his car incident to his arrest because he was not beside the vehicle and his arrest was unwarranted.  Finally, Defendant argues that Trooper Fletcher unreasonably extended the traffic stop in both duration and scope beyond the time necessary to complete a traffic citation.

The Government responds [Doc. 36] that law enforcement lawfully stopped and searched the car driven by Defendant Brown.  It contends that Trooper Fletcher had probable cause to stop the Chrysler for following too closely and speeding.  The Government argues that upon smelling marijuana emanating from the vehicle, Trooper Fletcher had probable cause to search the car.  Finally, it asserts that under the totality of the circumstances, the stop was not unduly long and that Trooper Fletcher had reasonable suspicion to extend the stop.

2

The Court held an evidentiary hearing on the suppression motion on October 20, 2021. Assistant United States Attorney Alan Scott Kirk appeared on behalf of the Government. Attorneys Michael Green and Travis D. McCarter represented Defendant Brown, who was also present. Following the presentation of evidence and the arguments of counsel, the Court took the suppression motion under advisement.

## II.    SUMMARY OF TESTIMONY

The Government presented the testimony of THP Trooper Ryan Fletcher, who testified that he has worked for the THP since 2016. He previously worked as a "road trooper" responsible for traffic stops and crash investigations. More recently, he works on the Interdiction Plus unit, which investigates the trafficking of narcotics, firearms, people, and stolen vehicles and enforces traffic safety. Before he was employed with the THP, Trooper Fletcher worked for the Campbell County Sheriff's Department for two years, where he was assigned to an interdiction unit on the Eighth Judicial Drug Task Force. Trooper Fletcher testified that he received expert accreditation in drug recognition in 2018. He estimated that he has made over one thousand traffic stops as an interdiction officer.

Trooper Fletcher stated that on July 2, 2019, he was on Interstate 75 at mile marker 60 in Monroe County, Tennessee. His THP Ford Explorer was parked in the median and facing northbound traffic in a flat, straight stretch of I-75. He estimated that he could see a little over a mile of the road. Trooper Fletcher said his patrol car is equipped with a video camera that records exterior and interior audio and video. He also wears a microphone on his belt to record interactions away from his patrol car. He stated the camera begins recording automatically when he turns on his blue lights, and he can turn it on manually. Trooper Fletcher testified that his patrol car is also equipped with radar equipment, which has a forward-facing and a rear-facing antenna and a

3

"counting unit." He said he received forty hours of classroom training on his radar equipment at the THP academy and spent sixteen hours estimating speeds on the road. He stated that he is recertified on the radar equipment annually, and the radar equipment is recalibrated every two years. Trooper Fletcher identified the certificates stating his radar was calibrated and certified for accuracy on February 7, 2019, and that his radar recertification expired on March 13, 2020 [Exh. 3]. He stated that at the time of the stop on July 2, 2019, he was trained and certified on his radar equipment. He tests his radar equipment each day. Trooper Fletcher confirmed that his radar was working properly on July 2, 2019, and had been tested that week.

Testifying about the recording from his patrol car's camera from July 2, 2019 [Exh. 1], Trooper Fletcher stated that he saw a dark gray Chrysler four-door car traveling at a higher speed than the traffic in front of it, including a commercial vehicle. Trooper Fletcher estimated that the commercial vehicle was traveling at 68 to 70 miles per hour. Trooper Fletcher manually started the video recording and watched the Chrysler pass. He saw the Chrysler drawing closer to the commercial vehicle and the other cars on the road. As the cars passed in front of his patrol car, Trooper Fletcher believed that the Chrysler was following the other vehicles too closely. Trooper Fletcher testified that the area where he was observing is a "high-crash area." He said the Tennessee Driver's Handbook advises either maintaining one car length per ten miles per hour of speed or maintaining a four second buffer between your car and the vehicle in front of it. Using a photograph [Exh. 2] taken from his in-car video, Trooper Fletcher testified that the Chrysler was traveling two car-lengths from the vehicle in front of it, when it passed in front of his parked patrol car.

Trooper Fletcher testified that once traffic cleared, he pulled onto the interstate and attempted to catch up to the gray Chrysler. He said he followed the Chrysler for just over two

4

miles, and when he was behind it, he "paced" it. Trooper Fletcher testified that he made a visual estimation of the Chrysler's speed, then he checked his own speed on his patrol car's speedometer, and then he checked the radar display. He stated that all three numbers were seventy-nine (79) miles per hour. He said he paced the Chrysler for close to one mile.

Trooper Fletcher stated that when he turned on his blue lights to initiate the traffic stop, the Chrysler drastically reduced speed, causing him to brake to avoid getting too close to it. The video recording reveals he stopped the Chrysler at 22:42:21Z, which is 5:42 p.m., Eastern Standard Time [Exh. 1].[1] He stated that he usually approaches a stopped car on the passenger side for safety reasons and to maintain view of the occupants. Once he engages the occupants, he introduces himself and gives the reason for the traffic stop. Trooper Fletcher stated that in this case, before he got out of the patrol car, he noticed that the driver of the Chrysler did not put the car in park upon stopping. He also noticed that the driver leaned toward the passenger side of the vehicle. Trooper Fletcher said that leaning toward the passenger side can indicate the person is retrieving paperwork, but here the driver stayed in that position for longer than normal and moved around. Trooper Fletcher said this conduct caught his attention. He said once the driver put the car in park and moved upright in the driver's seat, he got out of his patrol car and approached the vehicle on the passenger side.

Trooper Fletcher said the driver, whom he later identified as Cedric Brown, rolled the window down. Trooper Fletcher said at that point, as he began to introduce himself, he smelled a strong odor of raw marijuana coming out of the car. Trooper Fletcher said that smelling the odor

---

[1] Trooper Fletcher explained on redirect examination that the time stamp on the video recording is in Zulu time. The Court takes judicial notice of the fact that Zulu time, also known as Coordinated Universal Time, is five hours ahead of the Eastern Time Zone. National Weather Service, *Z-time (Coordinated Universal Time),* https://www.weather.gov/jetstream/time.

5

of marijuana in a stopped car is becoming a daily experience and that he can tell the difference between the odor of previously smoked marijuana, the odor of marijuana currently being used, and the odor of raw marijuana. He testified that due to the common use of marijuana and some states legalizing marijuana, the motoring public is more likely to admit to using marijuana, when he announces that he detects the odor of marijuana.

Trooper Fletcher said after seeing Defendant's movement within the car and smelling the odor of marijuana, he asked Defendant to get out of the car and told him he wanted to frisk him. He said Defendant made a motion with his hands that indicated Trooper Fletcher could proceed. Trooper Fletcher briefly patted Defendant down holding his hand flat and using the back of his hand across the Defendant's waist to make sure he was not concealing anything in his waistband. Trooper Fletcher then directed Defendant to sit in the front passenger seat of his patrol car.

Trooper Fletcher said when Defendant entered his patrol car, Trooper Fletcher noticed the odor of marijuana coming from Defendant's clothing. Trooper Fletcher talked with Defendant while entering his information on the mobile CAD system, which checks whether the driver's license is valid, confirms the address, and confirms the make and model of the car. Defendant's car was a rental car. Trooper Fletcher said that he also checks for outstanding warrants and driving history. Trooper Fletcher told Defendant that his car "reek[ed] of weed" and asked if Defendant had any marijuana in his car. Defendant denied there was any marijuana in the car and denied that he could smell marijuana in his car or on his person.

Trooper Fletcher testified that at this point he had probable cause to search Defendant's car due to the odor of marijuana. He said he texted his partner that he needed backup. He sent a text, rather than radioing for backup, because he did not want to "heighten the emotions of the situation." Trooper Fletcher said it is unusual for an individual in these circumstances to deny

6

having marijuana or that the odor is present. He said when Defendant denied having marijuana and denied the odor was in his car, that caused Trooper Fletcher to suspect that Defendant may have more than a small amount of marijuana for personal use. Trooper Fletcher said he texted his partner to come quickly. Trooper Fletcher stated that in some situations, he can search a car without another officer present, such as when he has probable cause to detain the driver in the back of his patrol car, but that was not the situation here. Trooper Fletcher also testified that there was a field to the right of the patrol car, and Defendant's emotions, breathing, and the tone of his voice indicated he was becoming more agitated. Trooper Fletcher said he did not want to give Defendant the opportunity to get out of the patrol car and flee, while he was searching Defendant's car, so he waited for his partner. Trooper Fletcher said it is also THP policy to wait for a second trooper to search, except for a few situations.

The video recording reveals that Trooper Andrew Connors arrived on the scene of the traffic stop and came to Trooper Fletcher's patrol car window at 22:54:36Z on the video recording. Trooper Fletcher testified that he asked Trooper Connors to go to the passenger side of his patrol car [Exh.1]. Upon exiting his patrol car and meeting Trooper Connors on the passenger side, Trooper Fletcher let Trooper Connors know to watch the Defendant, because they have had some problems with people fleeing across the field and into the woods at that location. Trooper Fletcher said at this point in the stop, it was his intention to conduct a full frisk of Defendant and then place him in the rear of the patrol car, while he and Trooper Connors searched the Chrysler. Trooper Fletcher testified that he did not intend to handcuff Defendant, at this point. While attempting to frisk Defendant, a struggle occurred, during which Trooper Connors put Defendant on the ground and handcuffed him. Trooper Fletcher testified that they located and seized a baggie containing a

7

pink powder, which they suspected was narcotics, from the small pocket of Defendant's jean shorts.

Trooper Fletcher stated that before searching Defendant's car, he asked Trooper Connors if he could smell the odor of marijuana, and Trooper Connors replied that he could. The troopers searched the Chrysler and found two firearms and multiple baggies of suspected drugs [Exh. 4]. Trooper Fletcher testified that one baggie contained marijuana. Trooper Fletcher testified about his report of the July 2, 2019 stop, which was completed and approved on July 9, 2019 [Exh. 5]. Trooper Fletcher said he wrote the narrative that appears on page six of the report. Following the search of the Chrysler, Defendant Brown was arrested and transported to the jail at the Monroe County Sheriff's Department.

On cross-examination, Trooper Fletcher testified that his radar signal extends out from his vehicle in a cone. He said he does not know the maximum range of his radar or how far he was from the Chrysler when he activated his radar. He confirmed that he had no information about Defendant Brown prior to stopping the Chrysler and no reason to suspect him of drug activity. Trooper Fletcher stated that Defendant complied with his signal to pull over. He agreed that he stated in his report that the odor of marijuana was "overwhelming." Trooper Fletcher testified that although detecting the odor of marijuana gave him probable cause to search the Chrysler, he did not inform Defendant he would be searching the car at the time he first smelled marijuana, because he wanted to move Defendant to a more controlled environment inside his patrol car first.

Trooper Fletcher agreed that when he texted Trooper Connors, he told Trooper Connors that Defendant was "flipping out" in his patrol car. He said defendant was taking shallow, quick breaths and began using his hands in an exaggerated manner while talking. These actions indicated to Trooper Fletcher that Defendant was becoming more emotional and that Defendant likely had

8

more than a misdemeanor amount of marijuana. Trooper Fletcher said his suspicions further increased when Defendant denied any odor of marijuana at all.

Trooper Fletcher said when he first encountered Defendant, he told Defendant that his intention was to check his driver's license and, if there were no problems with his license, he would give the Defendant a warning citation and let him go. He agreed that when he checked Defendant's driver's license on his computer, there were no problems with it. He agreed that he told Defendant that there were no problems with his license.

Trooper Fletcher stated that he did not immediately place Defendant in the back of his patrol car and search the Chrysler, because he was concerned about Defendant fleeing into the woods or escaping. He said due to Defendant's increased emotional state, he did not want to take the chance of frisking him outside the patrol car without a backup officer present. Trooper Fletcher agreed it was his standard investigative technique to have the motorist sit in the front passenger seat of his patrol car unless he or she refuses to do so. Trooper Fletcher said during the time the Defendant was in his patrol car, he was attempting to gauge the seriousness of the criminal activity, i.e., whether Defendant possessed a small amount of marijuana or an amount leading to more serious consequences. He agreed that Defendant was compliant through the entire stop until Trooper Connors arrived.

Trooper Fletcher said he planned to search Defendant's car as soon as he detected the odor of marijuana. He said he asked Defendant to get in the front seat of his patrol car, rather than placing him directly into the back seat, because he wanted to assess the level of criminal activity afoot, while writing the warning citation and checking for warrants. He said he wanted to get as much information as possible in a short time. He said he did not advise Defendant of the *Miranda* warnings while he was in the front seat of the patrol car. Trooper Fletcher said Defendant was

9

not free to leave as soon as he turned on his emergency lights. He agreed that he told Defendant he could not leave the patrol car to retrieve his cellphone. Trooper Fletcher said Defendant was not in custody until the troopers put him in the back of the patrol car. He said at that point, Defendant was not under arrest, but they had probable cause to search his car.

Trooper Fletcher testified that whether to have a drug detection dog perform a sniff of a vehicle is up to the officer who makes the traffic stop. He said that although Trooper Connors's dog is certified to detect marijuana, the THP is no longer training dogs on the odor of marijuana. Trooper Fletcher said in this case, he relied on his own detection of the overwhelming odor of marijuana. He agreed that he later told Trooper Connors that he wished he had allowed the drug dog to sniff the car. Trooper Fletcher said he made this comment because of the other drugs present, which would have been good experience for the dog. He said Trooper Connors ultimately ran his dog around the Defendant's car. Trooper Fletcher agreed that the video of the stop shows that Trooper Connors placed some of the drugs seized from the Chrysler back into the car before leading his dog around the car. Trooper Connors did not retrieve all of the drugs from the Chrysler after the dog sniff. Trooper Fletcher said he did not realize this occurred while on the scene and thought they had missed finding these drugs when they were later discovered by the rental company.

Trooper Fletcher testified that for most of his career he has not had access to a drug detection dog and has had to rely on probable cause or consent to conduct a search. He agreed that Defendant did not consent to a search of the Chrysler. He agreed that here he relied on probable cause from his own detection of the odor of marijuana, which came from Defendant's car and also from Defendant's clothing, once Defendant was seated in the patrol car. He agreed that Defendant was polite and responded to his questions. Trooper Fletcher did not recall telling the Monroe

10

County Sheriff's deputies that Defendant had been "combative" the entire time. However, he said if he made this comment, it was not accurate.

Trooper Fletcher said once Trooper Connors arrived, he told Defendant to step out of the patrol car. He said he and Trooper Connors needed to frisk Defendant more thoroughly before placing him on the patrol car's backseat while conducting the search. He agreed that he did not tell Defendant the reason he was being removed from the patrol car and frisked. He agreed that the situation quickly escalated after Trooper Connors arrived and the search was about to begin. Trooper Fletcher said that Trooper Connors held onto Defendant's waistband and asked Defendant to keep his hands on his head during the frisk. He said Defendant's stance, his tense demeanor, and his action of repeatedly dropping his hands suggested that Defendant was stalling while he decided whether to run or resist. Trooper Fletcher said that when Defendant stepped back with his right leg and brought his elbow down, Trooper Connors brought him to the ground. Trooper Fletcher said that Defendant's denial of the odor of marijuana when faced with Trooper Fletcher's intention to search the Chrysler indicated to him that Defendant could try to run once out of the patrol car.

Trooper Fletcher stated that he did not lock the doors of his patrol car, when he and Defendant entered it following the traffic stop. He agreed he previously said he locked the doors. Trooper Fletcher explained that he mistakenly thought he had locked them in this case, even though he typically does not lock his car while a motorist is inside.

Trooper Fletcher agreed that both he and Trooper Connors searched the Chrysler. He searched the passenger compartment and found firearms and a bag of pills. Trooper Connors searched inside the car and the trunk. Trooper Fletcher agreed that nothing in the passenger compartment of the car emitted the odor of marijuana, with the exception of Defendant. He agreed

11

that the bag of marijuana was found in the trunk. The marijuana was wrapped in a plastic bag that was tied in a knot and located with the other drugs inside a backpack. Trooper Fletcher stated that the bag containing all the drugs was open when they found it. He said there was just over an ounce of marijuana.

Trooper Fletcher testified that pursuant to THP policy, he turned off the audio recording on the scene while talking with Trooper Connors and the Monroe County officers. He said that Trooper Connors held Defendant's head on the hood of the patrol car while trying to search him incident to his arrest. Trooper Fletcher said they were not trained to do that and agreed the hood was hot. Regarding the struggle prior to Defendant's arrest, Trooper Fletcher testified that Defendant had his hand hooked in his belt loop after he was taken to the ground by Trooper Connors, but Trooper Connors could not see Defendant's hands. Trooper Fletcher said he told Trooper Connors where the Defendant's hands were, because Trooper Connors was on top of Defendant holding him down while trying to manipulate Defendant's hands. He said at one point, Trooper Connors and Defendant became twisted together. Trooper Fletcher said he narrated the positions to Trooper Connors so they could complete the arrest and move forward.

On redirect examination, Trooper Fletcher agreed that the time stamp on the video recording is in Zulu time. He testified that the dog sniff occurred after the search of the car and was done to train the drug dog. The dog sniff did not affect the probable cause to search the car. Trooper Fletcher said as soon as Defendant lowered the window and as he introduced himself, he had probable cause to search the car. He said he did not tell Defendant of his intent to search the car until he felt the situation was under control.

## III.    FINDINGS OF FACT

Based upon the testimony of Trooper Fletcher and the exhibits, the Court makes the following factual findings:

On July 2, 2019, Trooper Ryan Fletcher of the THP was parked in the median of I-75 facing northbound traffic with over one mile of visibility. Trooper Fletcher saw a gray Chrysler sedan following two car lengths behind the vehicle in front of it. Based on the Chrysler's speed in relation to a commercial truck, Trooper Fletcher thought the Chrysler was exceeding the speed limit. Trooper Fletcher caught up to the Chrysler in his patrol car and determined that the Chrysler was traveling at seventy-nine (79) miles per hour, based on pacing and his radar reading. Trooper Fletcher activated his blue lights and pulled the Chrysler over at 5:42 p.m. When the car pulled onto the shoulder, the driver, whom Trooper Fletcher later determined was Cedric Brown, did not immediately put the car in park. Trooper Fletcher observed Brown leaning across the front seat and moving around, before finally placing the car in park.

Trooper Fletcher approached the passenger side of the Chrysler. When Brown lowered the passenger side window, Trooper Fletcher detected the odor of raw marijuana from the car. Trooper Fletcher introduced himself and told Brown that he stopped him for following too closely and for going seventy-nine miles per hour in a seventy-mile-per-hour zone. He asked Brown for his driver's license and registration and asked Brown about his destination. Trooper Fletcher also asked if the Chrysler was a rental vehicle. Trooper Fletcher told Brown his goal was to give Brown a warning citation and directed Brown to get out of his car. Trooper Fletcher explained he would ask Brown some questions and complete the warning citation, and then Brown could be on his way.

As Brown approached Trooper Fletcher, who was standing between the Chrysler and his patrol car, Trooper Fletcher asked if he had any weapons. Brown denied having any weapons.

13

Trooper Fletcher patted the pockets and waistband of Brown's shorts, while explaining he was making sure Brown had no weapons. Trooper Fletcher then directed Brown to get in the front passenger side of his patrol car. Brown entered the patrol car two minutes into the stop. Once seated in the front of the patrol car, Trooper Fletcher checked Brown's driver's license on his computer and asked Brown how long he would be in Knoxville and how many children he had in Knoxville. Approximately one minute after entering the patrol car, Trooper Fletcher texted Trooper Connors requesting back up. Trooper Fletcher confirmed Brown's address and asked if Brown had ever been arrested. Brown said he went to prison in 2006 for a firearm offense but had been out of prison for more than ten years. Trooper Fletcher asked whether Brown had any firearms with him, and Brown denied having any.

Four minutes into the traffic stop, Trooper Fletcher told Brown that his car "reeks of weed" and asked if he had any marijuana in the car. Defendant denied having any marijuana in the car or that his car smelled of marijuana. Trooper Fletcher asked whether Brown had any other drugs in the car, which Brown also denied. Trooper Fletcher asked Brown if a drug dog would alert on the Chrysler. Brown responded by asking how the situation had advanced from a traffic stop to an inquiry about marijuana. Trooper Fletcher repeated that he smelled marijuana in the Chrysler and said he could smell marijuana on Brown, while Brown was seated in the patrol car. Brown continued to deny having any marijuana in his car.

At approximately five and a half minutes into the stop, Trooper Fletcher told Brown he intended to search the Chrysler and that he was not concerned about a misdemeanor amount of marijuana. Brown continued to deny having marijuana in his car and began moving around in the seat and gesturing. Brown asked Trooper Fletcher if he was asking for consent to search the Chrysler, and Trooper Fletcher responded that he could search without consent because he smelled

14

marijuana. Trooper Fletcher informed Brown that another trooper with a drug detection dog was coming to the scene. Brown said he was not giving permission to search the Chrysler and that it did not contain marijuana. At eight minutes into the stop, Brown asked Trooper Fletcher if he could get his cellphone from his car. Trooper Fletcher told Brown they would remain seated in the patrol car. At nine minutes into the stop, Brown asked Trooper Fletcher what he was doing on his computer, and Trooper Fletcher replied that he was working on the warning citation.

Approximately twelve minutes after Trooper Fletcher stopped the Chrysler, Trooper Andrew Connors arrived on the scene and walked up to the driver's side window of Trooper Fletcher's patrol car. Trooper Fletcher asked Trooper Connors to go to the other side of the patrol car, and once Trooper Connors was standing beside the passenger door, he directed Brown to get out. Trooper Connors attempted to frisk Brown, who repeatedly lowered his hands while talking to the troopers. Trooper Fletcher told Brown that Trooper Connors was frisking him before they placed him in the back of the patrol car, while they searched the Chrysler. When Brown continued to lower his hands, Trooper Connors put Brown on the ground and attempted to handcuff him. Once they handcuffed Brown, the troopers brought him to the front of Trooper Fletcher's patrol car and searched his pockets. Trooper Fletcher seized a baggie containing a pink substance, which he suspected to be narcotics, from the pocket of Brown's shorts.

Approximately twenty-one minutes after first stopping the Chrysler, Troopers Fletcher and Connors searched Defendant's car. When Trooper Connors opened the door to the Chrysler, Trooper Fletcher asked if he could smell marijuana, and Trooper Connors agreed that he could smell it. Trooper Fletcher found two firearms in the passenger compartment. Trooper Connors found several baggies of controlled substances inside a backpack in the trunk. One baggie contained more than an ounce of marijuana. The troopers did not find marijuana in the passenger

15

compartment of the Chrysler.  Defendant Brown was arrested and transported to the Monroe County Sheriff's Department.

## IV.  ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures.  U.S. Const. amend IV.  Defendant Brown argues that law enforcement violated his rights under the Fourth Amendment, because Trooper Fletcher lacked probable cause to stop him for a traffic violation, searched his car without probable cause, and unlawfully detained him beyond the time necessary to issue a traffic citation.  The Court examines each of these issues in turn.

### A.  Propriety of Traffic Stop

Trooper Fletcher testified that he stopped Defendant Brown's Chrysler after observing it following the vehicle in front of it too closely and speeding.  If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment."  *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994).  Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer.  *Id.* at 388; *see Whren v. United States*, 517 U.S. 806, 810 (1996.  Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).  In other words, probable cause means a substantial chance or likelihood of criminal conduct.  *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).  A stop based on probable cause that a traffic

violation has occurred is reasonable, without regard to the subjective motives of the officer. *Whren*, 517 U.S. at 813; *Ferguson*, 8 F.3d at 391.

The Government contends that Trooper Fletcher had probable cause to stop the Chrysler for following too closely and speeding. It asserts that Trooper Fletcher saw the Chrysler traveling two car lengths behind another vehicle, that he paced the Chrysler while traveling at seventy-nine miles per hour for one mile, and that he confirmed the Chrysler's speed with his radar. Defendant Brown argues that he was not following too closely for the traffic and weather conditions and that Trooper Fletcher's visual estimation of his speed as being nine miles per hour over the speed limit is a mere guess.

Tennessee Code Annotated § 55-8-124 (a) provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and condition of the highway." Our appellate court has recently examined "what constitutes a 'reasonable and prudent' following distance" under § 55-8-124(a). *United States v. Howard*, 815 F. App'x 69, 73-74 (6th Cir. 2020). Observing that the Tennessee state courts have not defined "reasonable and prudent," the court in *Howard* relied on the Tennessee Comprehensive Driver's License Manual ("Manual") to guide its analysis. *Id.* at 74 (citing Tenn. Dep't of Safety & Homeland Sec'y, Tennessee Comprehensive Driver License Manual 48–49 (July 1, 2018 ed.)); *United States v. Collazo*, 818 F.3d 247, 255 (6th Cir. 2016). Prior to 2010, the Manual instructed drivers to maintain one car-length of distance for every ten miles per hour of speed. *Id.* After 2010, the Manual "defines a safe following distance in terms of seconds rather than car lengths," providing that "drivers should generally maintain a following distance of at least two seconds" behind the preceding vehicle. *Howard*, 815 F. App'x at 74. "During 'interstate highway driving at higher speeds,' however, drivers should maintain a

17

following distance of '[a] minimum of four seconds.'" *Id.* (quoting Manual at 49). The court observed that it has used both standards in its decisions. *Id.*

Here, a photograph taken from the video recording by Trooper Fletcher's in-car camera that day shows the Defendant's car was no more than two car lengths from the preceding vehicle [Exh. 2]. Trooper Fletcher testified that Defendant was traveling at seventy-nine miles per hour when he caught up to the Chrysler and that he thought Defendant was exceeding the seventy-mile-per-hour speed limit when the Chrysler passed his patrol car. However, even assuming Defendant was traveling at the speed limit, he was following too closely. Defendant argues that he was operating the Chrysler reasonably in the flow of traffic and for the weather conditions, which were clear, sunny, and dry, and that there was sufficient space for another vehicle to enter the lane in front of him. However, Trooper Fletcher testified that this stretch of I-75 is a "high-crash area" and that Defendant was travelling too closely based on the Tennessee Driver's Manual. The Court finds that Trooper Fletcher had probable cause to believe the Chrysler was following too closely to the vehicle in front of it.

Defendant also questions Trooper Fletcher's visual estimate that he was traveling at nine miles per hour over the speed limit. He asks the Court to require additional indicia of reliability for probable cause when an officer estimates a car is traveling only slightly over the speed limit. Without finding that additional indicia of reliability are required, the Court finds that here such additional indicia of reliability are readily available. Trooper Fletcher checked his visual estimate by both pacing the vehicle for one mile and using his radar equipment.

To determine a vehicle's speed by pacing, the officer must travel at a constant distance from the subject vehicle for a length of time. *United States v. Carter*, 662 F. App'x 342, 344 n.1 (6th Cir. 2016) (affirming trial court's finding that trooper had probable cause to stop defendant

18

for speeding based on testimony of laser device reading and pacing). Pacing allows the officer to determine the subject vehicle's speed by using his or her own speed. In *United States v. Whaley*, this Court upheld an officer's probable cause determination, based upon pacing, when the officer had a "considerable opportunity" to observe the defendant's driving, as he matched the defendant's speed, which exceeded the speed limit by fifteen miles per hour. No. 1:04-CR-122, 2005 WL 8168971, *2 (E.D. Tenn. Jan. 11, 2005). In contrast, the undersigned has previously found an officer's pacing did not provide probable cause, when the trooper admitted that "true" and "accurate" pacing required following the vehicle for two tenths of a mile, which he did not do. *United States v. Wanda Hayes & Patrick Carney*, No. 3:19-CR-73-TAV-HBG, 2020 WL 4034309, *11 (E.D. Tenn. Feb. 21, 2020) (Report & Recommendation), *adopted by* 458 F. Supp. 3d 857 (E.D. Tenn Apr. 28, 2020) (Varlan, D.J.). In the instant case, Trooper Fletcher testified that he paced the Chrysler for one mile, during which time he was traveling at seventy-nine miles per hour. The Court finds that like the officer in *Whaley*, Trooper Fletcher had a considerable opportunity to track Defendant's speed while following directly behind him and matching his speed to Defendant's for one mile.

Finally, the Court finds that Trooper Fletcher confirmed his determination of the Chrysler's speed by using his radar equipment. Trooper Fletcher testified that his radar, which is regularly calibrated and tested, reported Defendant's speed as seventy-nine miles per hour. Based upon both his pacing of the Chrysler and his radar reading, the Court finds Trooper Fletcher had probable cause to believe Defendant was speeding. In summary, the Court finds Trooper Fletcher properly stopped Defendant because he had probable cause to believe Defendant was following the preceding vehicle too closely and speeding.

## B. Propriety of Search

Defendant contends the warrantless search of his car violated the Fourth Amendment. The Government asserts that Trooper Fletcher detected the odor of marijuana emanating from the Defendant's car within one minute of stopping the Chrysler. It contends that Trooper Fletcher properly searched Defendant's car pursuant to the automobile exception, based upon Trooper Fletcher's detection of the odor of marijuana. Defendant argues that Trooper Fletcher's behavior during the traffic stop and other facts demonstrate that Trooper Fletcher's claim that he smelled marijuana is not credible. Defendant also argues that the troopers could not search his car incident to his arrest.

It is well-settled that an officer may conduct a warrantless search of an automobile if the officer has probable cause to believe it contains contraband or evidence of criminal activity. *Carroll v. United States*, 267 U.S. 132, 153, 159 (1925); *see also Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018) (discussing evolution of automobile exception). The automobile exception to the warrant requirement of the Fourth Amendment stems from the automobile's ready mobility and pervasive regulation. *Collins*, 138 S. Ct. at 1669-70; *United States v. Keeling*, 783 F. App'x 517, 523 (6th Cir. 2019). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Our appellate court has held that an officer's detection of the odor of marijuana from a vehicle provides probable cause to search the vehicle. *United States v. Foster*, 376 F.3d 577, 588 (6th Cir.), *cert. denied*, 543 U.S. 1012 (2004). In this regard, the officer need not have any other suspicion or information, because "the detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle." *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (collecting cases).

Trooper Fletcher, who is trained in detecting the odor of marijuana, testified that when Defendant lowered the passenger side window, he smelled a strong odor of raw marijuana. The Court finds that Trooper Fletcher had probable cause to search the Chrysler based upon his detection of the odor of raw marijuana at the car's open window. Defendant Brown argues that Trooper Fletcher's testimony that he smelled the odor of raw marijuana is not credible. He contends that Trooper Fletcher's behavior and other facts surrounding the traffic stop contradict his testimony.

First, Defendant points to Trooper Fletcher's own behavior during the stop, which he contends reveals that he did not smell marijuana. He notes that when Trooper Fletcher spoke with him at the car window, Trooper Fletcher gave no indication that he smelled marijuana but, instead, went so far as to tell Defendant that if his driver's license had no problems, he would issue a warning and Defendant could go. Defendant contends that once he got out of the car, Trooper Fletcher did not conduct field sobriety tests or place him immediately into the back of his patrol car, as would have been consistent with having smelled marijuana. He also points out that Trooper Fletcher did not call for a back-up officer right away. Defendant argues that when Trooper Fletcher finally confronted him about the odor of marijuana while seated in the patrol car, Trooper Fletcher admitted he did not think Defendant had marijuana on his person. Defendant maintains that these behaviors show that Trooper Fletcher did not smell marijuana at the car's window.

The Court finds these alleged inconsistencies were explained by Trooper Fletcher during his testimony. Trooper Fletcher stated that he did not alert Defendant to the fact that he smelled marijuana in the car because he did not want to escalate the situation, while he was alone on the scene with Defendant. In this regard, the Court notes that Trooper Fletcher testified that his concern that Defendant might try to flee was already aroused, because Defendant did not

21

immediately put his car in park upon stopping but, instead, left the car in drive, while he reached across the seat and moved around. Trooper Fletcher testified that although he had probable cause to search the Chrysler as soon as he smelled marijuana, he moved Defendant into the front seat of his patrol car to investigate the extent of the criminal activity. In this regard, Trooper Fletcher testified that it is a regular occurrence for motorists to possess a small amount of marijuana for personal use and to admit to having that amount. Additionally, Trooper Fletcher was waiting on the arrival of Trooper Connors before beginning the search of Defendant's car. This is both consistent with THP policy, which requires two troopers for a search in most circumstances, and consistent with Trooper Fletcher's concern that Defendant Brown might try to flee, a concern that only increased as Defendant became more agitated. Finally, the Court notes that Trooper Fletcher testified that he smelled the odor of raw marijuana coming from Defendant's car and later Defendant's clothing. There was nothing about Defendant's driving or the smell of raw marijuana that would cause Trooper Fletcher to perform field sobriety tests on Defendant.

Defendant also points to other facts which he contends show Trooper Fletcher's claim that he smelled marijuana is not credible. The most significant of these is the absence of any marijuana inside the passenger compartment of the Chrysler. Defendant asserts that the only marijuana recovered from the scene was a small amount seized from the trunk, which was packaged inside a closed plastic baggie and contained in a zipped backpack or duffle bag. Defendant argues that this fact contradicted Trooper Fletcher's statement in the narrative of his police report that an "overwhelming" odor of marijuana came from inside the car.[2] However, Trooper Fletcher testified

---

[2] In Trooper Fletcher's narrative, he states that "[u]pon contact with the defendant [he] could smell the strong odor of marijuana coming from the vehicle" [Exh. 5, p.5]. However, he also states that "[w]hile defendant was in my patrol vehicle, the odor of marijuana was overwhelming" [Exh. 5, p.5].

that once Defendant was seated in his patrol car, he could smell the odor of marijuana on the Defendant's clothing. Thus, the strong odor of marijuana coming from the car could have also been from Defendant's clothing. The fact that the officers did not find marijuana inside the passenger compartment of Defendant's car does not eliminate the possibility that Trooper Fletcher smelled the odor of marijuana coming from the car while Defendant was seated inside it.

Finally, Defendant argues that other facts and circumstances contradict Trooper Fletcher's testimony that he smelled marijuana coming from the car. He contends that the video recording reveals that he emphatically and consistently denied having or smoking marijuana, when talking with Trooper Fletcher inside the patrol car and that he seemed surprised that Trooper Fletcher claimed to smell it. He also maintains that Trooper Fletcher's choice not to have the drug detection dog perform a sniff of the Chrysler, despite the dog's presence on the scene, indicates that Trooper Fletcher did not smell marijuana. Defendant argues that none of the other officers on the scene claimed to have smelled marijuana, with the exception of Trooper Connors, whom Defendant seems to suggest was prompted by Trooper Fletcher. In this regard, Defendant contends that Trooper Connors is later seen on the video appearing to sniff the baggie of marijuana, which would not be necessary if its odor was as prominent as Trooper Fletcher testified.

The Court also finds these apparent inconsistencies do not undermine Trooper Fletcher's credibility as to his detection of the odor of marijuana. First, the Court observes that although Defendant denied having marijuana in his car or that his clothing smelled like marijuana, the result of the search ultimately undermines Defendant's statements, because he possessed a baggie of marijuana in the trunk of the car. Trooper Fletcher explained that he did not ask Trooper Connors to perform a dog sniff on the Chrysler, because he was not used to having access to a drug dog. Moreover, per his statements to Defendant Brown inside the patrol car, Trooper Fletcher believed

23

he had probable cause to search the Chrysler without consent or other evidence, such as a dog alert. Although Defendant argues that none of the other officers on the scene, aside from Troopers Fletcher and Connors, commented on the odor of marijuana in the car, the video recording contains no audio of the other officers' commentary, if any. Trooper Fletcher testified that he turned his audio off when talking with the other officers on the scene. Thus, if another officer commented on the odor of marijuana, it would not have been captured on the recording. Finally, at 46:15 on the video recording [Exh. 6], the troopers sniff a different baggie of drugs, not the baggie of marijuana.[3] Thus, the Court finds the other facts raised by Defendant do not diminish Trooper Fletcher's credibility.

The Court finds that Trooper Fletcher's testimony that he smelled a strong odor of raw marijuana upon Defendant lowering the car's window is consistent with his repeated comments inside the patrol car that the Chrysler "reeked" of marijuana. It is also consistent with Trooper Fletcher's agreement that he smelled marijuana upon opening the car's door to begin the search. Finally, Trooper Fletcher's testimony is consistent with his narrative in his report, drafted a few days after the search, in which he stated that he smelled a strong odor of marijuana coming from the car and the odor of marijuana coming from Defendant's person was overwhelming [Exh. 5, p.6]. Thus, the Court finds Trooper Fletcher's testimony that he smelled a strong odor of raw marijuana coming from Defendant's car to be credible.

---

[3] The Court finds based upon the photograph of the evidence seized from Defendant and his car [Exh. 4], the baggie containing a dark green substance is near the windshield. At 45:48 on the video recording [Exh. 6], Trooper Fletcher takes a photograph of the evidence on the hood of his patrol car. Thereafter, Trooper Connors picks up a baggie near the front of the hood (what would be the bottom of the photograph), sniffs it, and puts it down. Trooper Fletcher picks up what appears to be the same bag, sniffs it, and puts it back down. Based on the position of the baggies of drugs in the photograph, it appears the troopers sniff a baggie containing a white substance.

24

The Court agrees with Defendant Brown that the troopers could not search his car incident to his arrest for resisting the frisk. In *Arizona v. Gant*, the Supreme Court held that officers could not search a car incident to the driver's arrest, when the driver was handcuffed and seated in the back of a patrol car at the time. 556 U.S. 332, 344 (2009). The Court held the search of defendant's car violated the Fourth Amendment, because law enforcement could not have reasonably thought defendant could gain access to his car during the search or that evidence of the offense for which he was arrested, driving on a suspended license, would be found in the car. *Id.* In the instant case, Defendant Brown was also handcuffed and seated in the back of a patrol car during the search of his car. Likewise, evidence of Brown's resisting the frisk, would not have been found in the car. Thus, without making any findings about the legitimacy of Defendant Brown's arrest, the Court finds the troopers could not search the Chrysler incident to Defendant's arrest. Nevertheless, as discussed above, the Court finds law enforcement properly searched Defendant's car pursuant to the automobile exception.

## C. Scope and Duration of Detention

Defendant also argues that the officers unreasonably detained him beyond the scope of the traffic stop. He asserts that at 5:51 on the video [Exh. 6], Trooper Fletcher told him that his driver's license checked out. He contends that the traffic stop should have concluded at that time. Instead, Trooper Fletcher continued to question him about his criminal history and the presence of drugs and firearms in his car. Defendant argues that all the evidence seized in exploitation of his illegal seizure should be suppressed. The Government responds that Trooper Fletcher's detention of Defendant in his patrol car, while awaiting the arrival of a backup officer to assist with the search of Defendant's car, was not unduly long and that Trooper Fletcher had reasonable suspicion to extend the stop. For the reasons discussed below, the Court finds the length and scope of the

detention did not violate the Fourth Amendment but that the unwarned questioning of Defendant in the patrol car violated the Fifth Amendment, because Defendant was in custody.

A stop "which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing the reasonableness of a *Terry* stop).

A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied,* 528 U.S. 1176 (2000). In the instant case, before the traffic stop was completed—indeed, as it began—Trooper Fletcher had probable cause to search the Chrysler based upon the odor of marijuana from inside the car. At that time, Trooper Fletcher had reasonable suspicion to detain Defendant Brown while investigating a possible drug crime. Although no longer restricted to the time necessary to

complete the traffic stop,[4] Trooper Fletcher's investigatory detention of Defendant Brown while investigating whether he possessed illegal drugs must be reasonable in duration and scope. *Sharpe*, 470 U.S. at 687.

Based upon the testimony of Trooper Fletcher and the video recordings introduced at the suppression hearing, the Court finds Defendant Brown was detained approximately twenty-one minutes from the time Trooper Fletcher stopped the Chrysler until he searched it. Trooper Fletcher smelled the odor of marijuana when Defendant lowered the passenger side window, about one minute after stopping Defendant. At this point, Trooper Fletcher had probable cause to search the Chrysler. However, Trooper Fletcher proceeded with the traffic stop, requesting Defendant's driver's license and registration and asking him to step out of the car. Within two minutes of stopping Defendant, Trooper Fletcher had directed Brown to enter the front passenger seat of his patrol car. Trooper Fletcher detained Defendant in his patrol car for approximately nine minutes, while waiting for Trooper Connors to arrive. During this time, Trooper Fletcher engaged in a blended investigation, in which he worked on the traffic stop (checking Defendant's driver's license using his in-car computer and working on the warning citation) and also investigated his suspicion that the Defendant's car contained marijuana. Trooper Fletcher confronted Defendant about the odor of marijuana in his car and on his person.

Trooper Connors arrived nine minutes after Defendant entered the patrol car. In the remaining ten minutes between Trooper Connors's arrival and the search of the Chrysler, Trooper Connors attempted to frisk Defendant before placing him in the back of the patrol car, Defendant

---

[4] There is no set length of time after which a traffic stop becomes per se unreasonable. *United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010). In addition to issuing a citation, actions such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are all typical inquiries incident to a traffic stop. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015).

failed to comply with repeated instructions to keep his hands on his head, a struggle ensued, and Defendant was ultimately handcuffed, searched, and detained in the back of the patrol car. The Court finds this last ten minutes of detention before the search began should not be attributed to the officers, because it stems from Defendant's actions that delayed the search. Accordingly, the Court examines whether the detention of Defendant in the front passenger seat of the patrol car for nine minutes before Trooper Connors's arrival is reasonable in duration and scope.

An officer may require the driver to get out of the vehicle during a traffic stop for officer safety. *Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997). "'A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop, . . . and conducting pat down searches upon reasonable suspicion that they may be armed and dangerous.'" *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005)). The focus of the inquiry is whether the officer's conduct was reasonable "in light of the surrounding circumstances and [the officer's] suspicions." *Id.*

In *United States v. Jacob*, our appellate court found that detaining defendants in the back of the patrol car, while the officers searched the car, was reasonable under the circumstances, including that the defendant's car had "lunged" forward, after the stop, which the officer took as evidence of an intent to flee. 377 F.3d 573, 579-80 (6th Cir. 2004), *cert. denied*, 543 U.S. 1171 (2005). Looking at the totality of the circumstances confronting the officers, the court found handcuffing and detention of the defendants "was not unreasonable where 1) the defendants had attempted to flee as investigators initiated the stop; 2) the investigators needed to control the stop environment; 3) the police did not question the defendants; and 4) the defendants were placed in a patrol car merely to secure the scene" while a drug dog performed a sniff of the car. *Id.* at 580;

*see also United States v. West*, 371 F. App'x 625, 630 (6th Cir.) (holding that detaining driver in the back of patrol car while officer conducted dog sniff of car was reasonable, when driver yelled at officer upon his approaching car, driver refused to show his hands, only one officer was on scene of traffic stop, and car contained a passenger), *cert. denied* 562 U.S. 918 (2010).

In the instant case, the Court finds that detaining Defendant Brown for nine minutes in the patrol car to permit another Trooper to arrive on the scene was reasonable. Trooper Fletcher testified that Defendant Brown delayed putting the vehicle in park, after he was stopped, and moved around inside the car more than usual, before finally putting the vehicle in park. This unusual activity caught Trooper Fletcher's attention. After smelling the strong odor of marijuana, Trooper Fletcher determined to detain Defendant in his patrol car until another officer arrived and while further investigating the presence of drugs in the car. During the time in the patrol car and after confronted with Trooper Fletcher's detection of the odor of marijuana, Defendant became increasingly agitated. The Court finds that Trooper Fletcher's detaining Defendant in the front passenger seat of his patrol car was reasonable under these circumstances and was not prolonged. Thus, the Court finds the duration and scope of the detention did not violate the Fourth Amendment.

The Court also examines Trooper Fletcher's questioning of Defendant in the patrol car under the Fifth Amendment. The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." To ensure this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied*, 523 U.S. 122 (1998). "Statements elicited in noncompliance with this rule may not be admitted for

certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Salvo*, 133 F.3d at 948.

Law enforcement officers must advise a person of the *Miranda* warnings, when the person is questioned while in police custody. *Miranda*, 384 U.S. at 478-79; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (holding that the obligation to administer *Miranda* warnings only arises if there has been "such a restriction on a person's freedom as to render him 'in custody'"). In the instant case, Trooper Fletcher undoubtedly questioned Defendant Brown to determine whether he was involved in criminal activity, specifically possession of illegal drugs or firearms. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation" under *Miranda* "express questioning [by the police] or its functional equivalent[,]" which is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"). The issue in this case is whether Defendant Brown was in custody for purposes of the Fifth Amendment when questioned by Trooper Fletcher inside the patrol car.

To determine whether an individual is in custody for purposes of receiving the *Miranda* warnings, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. *Stansbury*, 511 U.S. at 318 (holding that the court looks to "the objective circumstances of the interrogation, not on the subjective views" of the questioning officers or the defendant); *Salvo*, 133 F.3d at 948. In other words, would a reasonable individual in the same position as the Defendant have felt free to leave. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). Our appellate court has set forth several factors useful in determining whether an individual is in custody:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Salvo*, 133 F.3d at 950; *see also Swanson*, 341 F.3d at 529. Ultimately, the Court must decide "'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *cert. denied*, 490 U.S. 1019 (1989); *Swanson*, 341 F.3d at 529.

In the instant case, Defendant Brown did not have unrestrained freedom to move about, nor was he free to leave, as he was the subject of a traffic stop. While acknowledging that a traffic stop curtails the driver's and the passengers' freedom of movement, the Supreme Court has held that an individual briefly detained for a routine traffic stop "is not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 437, 440 (1984). In so holding, the Court likened a traffic stop to a "*Terry* stop" and observed that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.* at 440. However, an investigatory detention can evolve into a custodial interrogation. *Knox*, 839 F.2d at 292 & 296 (Jones, J., concurring).

In the instant case, the Court finds that Trooper Fletcher's requiring Defendant to get into his patrol car, where the trooper could question him while entering information into his in-car computer caused the traffic stop to evolve into a custodial interrogation. Trooper Fletcher's detention of Defendant Brown in his patrol car raised the level of custody beyond that of the typical

31

traffic or *Terry* stop. An examination of the *Salvo* factors supports this conclusion. First, the Court finds Trooper Fletcher's purpose in questioning Defendant Brown was to determine whether he had more than a small amount of marijuana. Trooper Fletcher testified that he wanted to question Defendant to determine the extent of the criminal activity that was afoot.

Second, the Court finds that the location of the questioning—the interior of the patrol car— was coercive. An officer may properly ask a driver to get out of his or her vehicle during a traffic stop. *Pennsylvania v. Mimms,* 434 U.S. 106, 111 (1977); *United States v. Alexander,* 467 F. App'x 355, 362 (6th Cir.), *cert. denied*, 566 U.S. 1004 (2012). However, the Court finds that placing a detained individual inside a police car heightens the custodial nature of the detention. For example, the officers' placing the suspect into the back seat of a patrol car and continuing to question him, after he declined consent to search his car, can transform a *Terry* stop into an arrest. *United States v. Richardson,* 949 F.2d 851, 857-58 (6th Cir. 1991); *see also United States v. Bradshaw*, 102 F.3d 204, 211-12 (6th Cir. 1996) (holding that "[d]etention in a police car does not automatically constitute an arrest" but may do so when the detention exceeds "the purpose and objective of the stop"), *cert. denied* 520 U.S. 1178 (1997). "[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.'" *Howard*, 815 F. App'x at 79 (quoting *Howes v. Fields*, 565 U.S. 499, 509 (1994)) (analyzing questioning of driver while standing beside the patrol car and passenger while inside the car). However, questioning a motorist inside a patrol car changes the dynamic. *See United States v. Lopez & Salcedo*, No. 3:19-CR-98-TAV-HBG, Doc. 47, p.53 (E.D. Tenn. Aug. 14, 2020) (Report & Recommendation).

Third, while the length of the questioning was brief, "other indicia of custody" were present. Trooper Fletcher did not tell Defendant that the questioning was voluntary or that he

could decline to be questioned inside the patrol car. To the contrary, when Defendant asked to go to his car to retrieve his phone, Trooper Fletcher said he could not do so. Thus, Defendant did not possess unrestrained freedom of movement during questioning. Finally, it was Trooper Fletcher who initiated the stop, the move to the patrol car, and the questioning. Based on an analysis of the *Salvo* factors, the Court finds that the questioning was custodial and that the *Miranda* warnings were required at the point Trooper Fletcher began to question Defendant Brown inside the patrol car. The Court finds that Defendant Brown's statements inside the patrol car should be suppressed.

While Defendant Brown made some statements once he was ordered out of the patrol car, the Court finds the bulk of these statements were not in response to questioning by the troopers. However, after Defendant was handcuffed and placed on the ground a second time, the troopers searched his pockets incident to his arrest and seized a baggie containing a pink powder. Trooper Fletcher asked Defendant to identify the substance in the baggie. When Defendant did not reply, Trooper Fletcher stated that it did not matter if Defendant answered, because law enforcement would find out. Thereafter, Defendant responded, "It's molly." The Court finds this statement identifying the drugs seized from his pocket should also be suppressed.

Questions "'normally attendant to arrest and custody'" do not constitute interrogation for purposes of the *Miranda* warnings. *United States v. Woods*, 711 F.3d 737, 741 (6th Cir. 2013). In *Woods*, the court determined the officer's question "what is in your pocket" upon feeling a hard object while frisking defendant was not interrogation but, instead, was "an automatic, reflexive question directed at ascertaining the identity of an object that is legitimately within the officer's power to examine as part of a search incident to an arrest." *Id.* The court found that the officer's question "was not reasonably likely to elicit an incriminating response beyond what he was already entitled to know" and, thus, "was not intended to obtain incriminating information." *Id.* at 742.

Thus, an officer's question that is the "natural and automatic response to the unfolding events during the normal course of an arrest," is not custodial interrogation requiring the *Miranda* warnings. *Id.* at 741.

Here, while Trooper Fletcher was entitled to discover the baggie of pink powder during a search incident to Defendant's arrest, the trooper's question about the identity of the substance was intended to elicit incriminating information, i.e., what type of illegal substance was in the baggie. *See United States v. Sydnor*, No. 6:16-CR-21-ART-HAI-2, 2016 WL 8672913, *10 (E.D. Ky Dec. 9, 2016) (holding officer's question "why would you be going to jail?," in response to defendant's asking to put on his shoes before he went to jail during execution of search warrant, was a direct question intended to elicit an incriminating response). In *United States v. Smith*, the Northern District of West Virginia analyzed a similar situation. No. 2:13CR46, 2014 WL 51255, *3 (N.D. W. Va. Jan. 7, 2014). In *Smith*, the officer seized a container from defendant's pocket during a search incident to arrest, opened the container, and saw it contained a white powder. *Id.* The officer asked, "What's this?," to which defendant responded it was methamphetamine. Distinguishing *Woods*, the court found the question by the officer was interrogation, because it was "an express question that the officer should have known was reasonably likely to elicit an incriminating response from [d]efendant." *Id.* The Court finds the same reasoning applies here, and Defendant's statement that the pink powder seized from his pocket was "molly" should be suppressed.

To summarize, the Court finds the detention of Defendant Brown in the front of Trooper Fletcher's patrol car, while Trooper Fletcher awaited the arrival of another trooper to assist in the search of Defendant's car was reasonable in duration and scope under the circumstances of this case. However, the Court finds that Defendant should have been provided the *Miranda* warnings

34

and that any statements he made in the patrol car and his statement identifying the drugs in his pocket must be suppressed.

## V.  CONCLUSION

After carefully considering the parties' filings and arguments, the evidence, and the relevant legal authorities, the Court finds Trooper Fletcher properly stopped Defendant Brown's car for traffic violations.  The Court finds law enforcement properly searched the Defendant's vehicle pursuant to the automobile exception to the warrant requirement, following Trooper Fletcher's smelling the strong odor of marijuana emanating from the car.  Finally, the Court finds that detaining Defendant Brown in a patrol car for nine minutes while awaiting the arrival of another trooper was reasonable under the totality of the circumstances, but the statements he made inside the patrol car should be suppressed.  Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 34**] be granted in part, in that his statements inside the patrol car and his identification of the substance seized from his pocket should be suppressed.  Defendant's suppression motion should be denied in all other respects.[5]

Respectfully submitted,

Bruce Guyton

United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).