```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TENNESSEE
 2                   AT KNOXVILLE, TENNESSEE
   _____
 3                                 )
   UNITED STATES OF AMERICA,       )
 4                                 )
             Government,           )
 5                                 )
   vs.                             ) Case No. 3:19-cr-191
 6                                 )
   CEDRIC BROWN,                   )
 7                                 )
             Defendant.           )
 8  _____)
```

9            **SUPPRESSION HEARING PROCEEDINGS**
           **BEFORE THE HONORABLE H. BRUCE GUYTON**

10
               **Wednesday, October 20, 2021**
11                  **9:30 a.m. to 11:15 a.m.**

12  **APPEARANCES:**

13             **ON BEHALF OF THE GOVERNMENT**:

14             ALAN SCOTT KIRK, ESQ.
               U.S. DEPARTMENT OF JUSTICE
15             OFFICE OF U.S. ATTORNEY
               800 Market Street
16             Suite 211
               Knoxville, TN 37902
17
               **ON BEHALF OF THE DEFENDANT:**
18
               MICHAEL J. GREEN, ESQ.
19             TRAVIS DOYLE MC CARTER, ESQ.
               GREEN, WATERS OGLE & MC CARTER
20             117 Court Avenue
               Sevierville, TN 37862
21

22
    **REPORTED BY:**
23
    Teresa S. Grandchamp, RMR, CRR
24  P.O. Box 1362
    Knoxville, Tennessee 37901
25  (865) 244-0454

1            **INDEX**

2    <u>**WITNESS FOR THE GOVERNMENT:**</u>                    <u>PAGE</u>

3    <u>**TROOPER RYAN FLETCHER**</u>

4    Direct Examination                                    4
     By Mr. Kirk
5
     Cross-Examination                                    43
6    By Mr. Mc Carter

7    Redirect Examination                                 69
     By Mr. Kirk
8

9                        **EXHIBITS**

10
     <u>**FOR THE GOVERNMENT:**</u>
11
        <u>**EXHIBIT**</u> (DESCRIPTION)              <u>ID:</u>      <u>IN EVID:</u>
12
        **Exhibit No. 1**(Video)                11          12
13      **Exhibit No. 2**(Still Frame Shot)      18          19
        **Exhibit No. 3**(Training Certificates) 23          23
14      **Exhibit No. 4**(Photograph)            38          39
        **Exhibit No. 5**(THP Report)            41          43
15

16   <u>**FOR THE DEFENDANT:**</u>

17      **Exhibit No. Exhibit No. 6**(Video)     69          69

18                  * * * * * * * *

19

20

21

22

23

24

25

 1              THE COURTROOM DEPUTY:  All rise.

 2              The United States District Court for the

 3    Eastern District of Tennessee is now open pursuant to

 4    adjournment with the Honorable Bruce Guyton, United

 5    States Magistrate Judge, presiding.

 6              Please come to order and be seated.

 7              Case No. 3:19-cr-191, United States versus

 8    Cedric Brown.

 9              Here on behalf of the defendant is Michael

10    Green and Travis McCarter.

11              Is counsel for the defendant present and ready

12    to proceed?

13              MR. MC CARTER:  We are.

14              THE COURT:  And here on behalf of the

15    government is Alan Kirk.

16              Is counsel for the government present and ready

17    to proceed?

18              MR. KIRK:  Present and ready.  Good morning,

19    Your Honor.

20              THE COURT:  Good morning, Counsel.

21              Mr. Brown, can you hear me, sir?

22              THE DEFENDANT:  Yes, sir.

23              THE COURT:  Mr. Brown, your case is before the

24    Court this morning for the Court to hear testimony with

25    regard to the Defendant's Motion to Suppress,

1  Court-Filed Document No. 34.

2          Is the government ready to proceed?

3          MR. KIRK:  Yes, Your Honor.

4          THE COURT:  All right.  Call your first

5  witness, please.

6          MR. KIRK:  Yes, Your Honor.  The government

7  would call Trooper Ryan Fletcher.

8          (The witness was thereupon duly sworn.)

9          THE COURTROOM DEPUTY:  Please be seated.

10                    **TROOPER RYAN FLETCHER**,

11  having been first duly sworn, was examined and testified

12  as follows:

13                    DIRECT EXAMINATION

14  BY MR. KIRK:

15  Q.       Okay.  Good morning, Trooper Fletcher.

16  A.       Good morning, sir.

17  Q.       And it's Trooper Ryan Fletcher.  And that's

18  F-l-e-t-c-h-e-r?

19  A.       That's correct.

20  Q.       And who is your current employer, Trooper

21  Fletcher?

22  A.       The Tennessee Highway Patrol.

23  Q.       If you could, if you could tell the Court a

24  little bit about your experience as a highway patrolman,

25  how long you've been with the Tennessee Highway Patrol,

1  and what your duties are there.

2  A.        Okay.  I became a trooper with the Tennessee

3  Highway Patrol in 2016.  I was assigned to the Knoxville

4  district as a road trooper responsible for traffic

5  stops, things like that, crash investigations on the

6  interstate and state highways within the Knoxville

7  district.

8  Q.        Do you have any prior law enforcement

9  experience?

10  A.        I was with the Campbell County Sheriff's

11  Department from 2014, until coming to the Tennessee

12  Highway Patrol.

13  Q.        And what did you do with the Campbell County

14  Sheriff's Department?

15  A.        Similar duties.  Answering calls and things.  I

16  was also assigned to the Eighth Judicial Drug Task Force

17  as an interdiction unit.

18  Q.        Okay.  And your current unit assigned with the

19  Tennessee Highway Patrol?

20  A.        I'm with the interdiction -- it's called

21  Interdiction Plus with the Tennessee Highway Patrol.

22  Q.        Okay.  Let's talk a little bit about your

23  training and education, if you could, please.

24  A.        Yes, sir.  Throughout my career, I've been able

25  to attend both basic and expert-level classes.  Started

1  with -- I was able to get my drug recognition expert

2  accreditation in 2018, and I also have some background

3  in criminal investigations, human behavior, and criminal

4  interdiction on both the basic and upper level.

5  Q.      So what are your duties and responsibilities as

6  an interdiction officer?

7  A.      So, as an interdiction officer, we still share

8  the same responsibilities as far as working the roadway,

9  enforcing safety, high visibility.  We still investigate

10  crashes and do your typical duties as a trooper, but we

11  also are tasked with an all-crimes approach.  We are one

12  of the units that sit highly visible on the interstate

13  looking for different types of narcotics or firearms

14  trafficking, human trafficking.  We do stolen vehicles,

15  VIN swaps, all kinds of investigations into larger

16  criminal activity.

17  Q.      And if you could just maybe ballpark about how

18  many traffic stops you think you've made as an

19  interdiction officer.  Just a rough estimate.

20  A.      It would be more than a thousand.  I mean, over

21  the -- it's quite a high amount.

22  Q.      Okay.  Let's talk a little bit about this

23  particular traffic stop --

24  A.      Yes, sir.

25  Q.      -- on July 2nd, 2019.  Do you recall that

1 traffic stop?

2 A.        I do.

3 Q.        And in preparation for today, have you reviewed

4 your Tennessee Highway Patrol report on this stop?

5 A.        I have.

6 Q.        And have you reviewed the dash camera?

7 A.        Yes, sir.

8 Q.        And we'll get into the nuts and bolts of that,

9 but let's first talk about where you were on July 2nd,

10 2019.  Do you recall where you were?

11 A.        Yes, sir.  I was on Interstate 75 at the

12 60-mile marker in Monroe County, Tennessee.  I was

13 facing the northbound traffic, and I was in a flat,

14 straight area of I-75, highly visible, for approximately

15 a mile, maybe more.

16 Q.        Okay.  You were parked in the median?

17 A.        I was parked in my -- and I was in a marked

18 Tennessee Highway Patrol Ford Explorer.

19 Q.        Okay.  So that's an SUV?

20 A.        Correct.

21 Q.        Sport utility vehicle.

22          Let's talk a little bit about your patrol car.

23 A.        Okay.

24 Q.        If you could, tell us a little bit about some

25 of the equipment your patrol car uses.  Let's first talk

DIRECT EXAMINATION - TROOPER RYAN FLETCHER

1    about the camera system.

2    A.        Yes, sir.

3    Q.        If you could explain to the Court how your

4    camera system operates.

5    A.        Okay.  We have an interior- and exterior-facing

6    video which also captures audio.  We wear a mic on our

7    belt to capture all audio during interactions.  I have a

8    forward-facing which captures outside of the window a

9    pretty wide view, and then the interior of my -- of my

10   vehicle also facing back towards myself and anybody that

11   may be in my vehicle.

12   Q.        And when you say forward out the window, do you

13   mean like the front windshield?

14   A.        Correct.

15   Q.        Is that camera system recorded?

16   A.        It is.

17   Q.        And how does that work?

18   A.        When we activate -- there is multiple ways that

19   it may be activated.  Primarily it's activated -- you

20   can manually turn it on in case of an instance where you

21   may not activate your patrol lights.  Otherwise, it's --

22   when you activate your emergency equipment, it

23   automatically comes on.

24             Typically, in my duties, it's manually

25   activated as to try to capture whatever violation prior

1  to initiating the emergency equipment.

2  Q.        Okay.  But when you say initiate the emergency

3  equipment, you're referring to the blue lights coming

4  on?

5  A.        Correct.

6  Q.        Okay.

7  A.        Yes, sir.

8  Q.        And is that data then stored; the video and

9  audio, is it stored somewhere?

10  A.        Yes, there is a 90-day retention on videos that

11  are not saved, like a significant event, and then once

12  it's saved, it's on our server for five years.  And then

13  it's moved around, but, you know, it's accessible.

14  Q.        And that data is stored and kept in the

15  ordinary course of the Tennessee Highway Patrol?

16  A.        That's correct.

17  Q.        Okay.  And as I asked earlier, you've viewed

18  this video.  Has it been substantially altered in any

19  way, other than maybe editing for time?

20  A.        Correct.  That's correct.  It's an accurate

21  video that I --

22  Q.        Let's talk a little bit about your speed

23  detection equipment.

24  A.        Yes, sir.

25  Q.        Tell us a little bit about that.

1  A.        It's equipped with a forward-facing and

2  rear-facing antenna, which has a counting unit, which

3  displays -- there is three displays on it.  It will

4  display my speed, the moving or stationary speed, and --

5  whether I'm moving or stationary, sir.  And then the

6  center will -- if I want to lock that speed in, I can

7  lock it in.  And it will display that permanently until

8  I take it off.  So my vehicle is equipped with a

9  forward- and rear-facing antenna and the counting unit

10 itself.

11 Q.        Okay.  Have you had some training, on-the-job

12 experience, of how that speed detection equipment works?

13 A.        Yes, sir.  With the Highway Patrol

14 specifically, as a cadet in the academy, you receive

15 40 hours of training on radar equipment in the class,

16 and then you have to do a 16-hour on the road actually

17 estimating speeds, and then you have a plus or minus

18 three miles per hour, you know, that you have to get it

19 within.

20        And then each year we're recertified, an

21 eight-hour recertification.  And then every two years,

22 the equipment itself is recalibrated by THP's technical

23 people, you know.  So --

24 Q.        Did you successfully complete those training

25 certificates or requirements?

1   A.      Yes, sir.

2   Q.      Was your radar equipment -- had it been

3   calibrated within that window, that one-year window on

4   July 2nd, 2019?

5   A.      The calibration, if I'm not mistaken, is every

6   two years.

7   Q.      I'm sorry.  Every two years.

8   A.      Yes, it was.

9   Q.      And then how often were they tested?

10  A.      They are tested daily.

11  Q.      Okay.  And do you recall if your equipment had

12  been tested within that week?

13  A.      It had been that week, yes, sir.

14  Q.      And was -- to the best of your knowledge and

15  experience, was it properly working on July 2nd, 2019?

16  A.      Yes, sir, it was.

17  Q.      All right.  I want to pull up first Government

18  Exhibit 1.

19          (Government's Exhibit 1 was marked for

20           identification.)

21          MR. KIRK:  If I can switch to -- thank you.

22  BY MR. KIRK:

23  Q.      I have on the screen Government Exhibit 1.  Do

24  you recognize just this -- before I hit play, do you

25  recognize this scene (indicating)?

1  A.       Yes, this is where I described earlier.  I'm

2  sitting in the median at the 60-mile marker.  This is

3  the front of my vehicle facing the -- northbound of

4  I-75.

5  Q.       Okay.  And as we talked about earlier, your

6  in-car equipment and the video, is this the same video

7  from that day on July 2nd, 2019?

8  A.       Yes, sir.

9       MR. KIRK:  All right.  Your Honor, with that,

10  I'd like to -- the government would like to offer

11  Government Exhibit 1, which is Trooper Ryan Fletcher's

12  in-car video from July 2nd, 2019.

13       THE COURT:  Any objection?

14       MR. MC CARTER:  No objection, Your Honor.

15       THE COURT:  All right.  Exhibit 1 will be

16  marked and received.

17       (Government's Exhibit 1 was received into

18        evidence.)

19       MR. KIRK:  And, Your Honor, just for the

20  preview of the Court, what the government has done is

21  edited this for time.  So it's not a substantially long

22  video.  And we've also put together in this video the

23  front-facing and the interior-facing camera of the car

24  together just for efficiency.  And I've also shared a

25  copy with defense counsel and the courtroom deputy.

1  BY MR. KIRK:

2  Q.       All right.  Trooper Fletcher, I'm going to go

3  ahead and hit play on this.  I'm going to just pause it

4  a few seconds in.

5  A.       Yes, sir.

6  Q.       And do you recall what vehicle was the

7  defendant's vehicle?

8  A.       It was a dark gray Chrysler four-door vehicle.

9           (Video file played in open court.)

10  BY MR. KIRK:

11  Q.       Okay.  I've paused it at 19 seconds into the

12  video.  Do you see the car that you're going to

13  eventually initiate a traffic stop on where I paused it?

14  A.       It's going to be the third car back, the gray

15  four-door vehicle in the right lane.

16  Q.       I just circled it with a red circle.  Is that

17  it (indicating)?

18  A.       That's correct.

19  Q.       Let me talk a little bit about -- you said you

20  had a pretty good view of the interstate from where you

21  were.  Can you describe what you could see from your

22  driver's seat?

23           Now, I know we only get a snippet of your view,

24  but if you can describe for the Court what all you can

25  see just sitting in your driver's seat.

1  A.      Yes, sir.  This is going to be one of the few

2  flat, straight areas in Tennessee.  You can see almost a

3  mile or maybe at or just a little more than a mile down

4  the road.  There is nothing obstructing my vehicle on

5  either side.  There is a bridge to my left, but you can

6  see, you know, all the way through.

7           As I'm looking right south -- I'm looking in

8  the northbound lane south -- I observed a vehicle

9  traveling at a higher speed than the other traffic

10 around it.  And so I manually initiate my video camera,

11 one, because I observed the defendant's vehicle closing

12 in on traffic in front of it.  So I manually started my

13 video and waited for it to pass.

14 Q.      At that point in time, did you know the speed

15 of the defendant's vehicle?

16 A.      So, at this time, it was just a mere estimation

17 by sitting stationary not using my radar.  So I see

18 other vehicles on the roadway.  Right in the beginning

19 of this video, there was a commercial vehicle that

20 passed.

21          With the Highway Patrol, we do a lot of work

22 with commercial vehicle enforcement, and one of the

23 things throughout my time with the Highway Patrol

24 specifically is -- especially in a highly-visible area

25 like I'm sitting -- commercial vehicles are generally

1  going to be going either the speed limit or just below.

2  It's their livelihood.  They're very particular about

3  keeping their license clear.

4         So I see this commercial vehicle, and I'm able

5  to estimate that it would be going 68 to 70 miles per

6  hour.  That would be my -- that would be what I would

7  base any car rounded on.  But, again, this is not using

8  my radar equipment.  I'm just -- I'm sitting stationary

9  watching.

10        So I see the vehicle that you circled moving at

11  a high rate of speed than not only the commercial

12  vehicle but the other vehicles on the roadway.  And I

13  also observe it to be coming closer to the traffic as

14  opposed to maintaining a distance.

15  Q.       That commercial vehicle, was that the blue cab

16  with the white 18-wheeler we saw go by a few seconds

17  prior?

18  A.       That's correct.

19  Q.       All right.  What I'm next going to do is just

20  go frame by frame --

21  A.       Okay.

22  Q.       -- for just a couple of seconds.

23        (Video file played in open court.)

24  BY MR. KIRK:

25  Q.       Okay.  I want to pause right here for a minute.

1        Did you notice any other traffic violations as

2    these three vehicles, including the defendant's vehicle,

3    are driving by you?

4    A.       I did.  The violation of following too closely.

5    Q.       Okay.  Let's talk about following too close.

6    What are some of the things that you're trained and you

7    look for for that traffic violation?

8    A.       So, as we're probably aware, the Tennessee Code

9    Annotated for following too close, if just read, it

10   appears to have some broad understanding.

11       With the Highway Patrol, we are trained

12   specifically on -- so this roadway is considered an area

13   of concern for the Highway Patrol.  It's a high-crash

14   area, lots of fatalities, both in Monroe and Loudon

15   Counties.  This -- I'm sure we've all experienced this

16   interstate gets shut down a few times a month because of

17   a large-scale issue.

18       A lot of those are in reference to -- very

19   specifically to violations; speed in concert with

20   following too close.  One of the things that we use in

21   following too close is the Tennessee Driver's Handbook,

22   which is taught to -- you know, across this state, but

23   it's also in other states as well.

24       They use two forms of how to gage how close a

25   vehicle is.  At 70 miles per hour, they -- they -- we

1  teach one car length per ten miles an hour.  So at

2  70 miles an hour, this would be a seven-car-length

3  estimation of distance.  And all that goes in because of

4  perception, reaction timing of drivers and vehicles, as

5  well as the speed, conditions of the roadway, things

6  like that.

7          And then they also -- on the interstate, they

8  would use a four-second buffer.  So you'd pick a -- and

9  we teach about this when we stop people.  "Hey, the

10  reason I stopped you was following too closely."  We'll

11  either say one car length per ten miles per an hour to

12  give them a visual, or we'll give them a visual, or

13  we'll instruct them that you could look at a sign on the

14  roadway and when the car in front of you passes it, you

15  should be able to count one-thousand-one and so on to

16  one-thousand-four at interstate speeds, and that would

17  give you that safe following distance.

18          So we try to educate on every stop.  Especially

19  with these two violations in concert, they tend to give

20  us a lot of issues, especially on this roadway.

21  Q.      Okay.  Now, I want to ask you about these white

22  dash lines that we see on the interstate that divide the

23  right lane and left lane or divide the lanes, the center

24  dash lines.

25  A.      Okay.

1  Q.      Are those a standard length?

2  A.      Ten feet.

3  Q.      Is that standard across the interstate system?

4  A.      Yes.

5  Q.      And then the distance between the white dash

6  lines, is that a standard distance across the interstate

7  system?

8  A.      Yes, sir.

9  Q.      And what's that distance?

10  A.      They're 30 feet apart.

11          MR. KIRK:  I'm going to pull up Government's

12  Exhibit 2.

13          (Government's Exhibit 2 was marked for

14           identification.)

15  BY MR. KIRK:

16  Q.      Okay.  Government's Exhibit 2 is just a

17  picture, a still frame shot, from Government Exhibit 1.

18  Do you recognize this still frame shot?

19  A.      It is from the video we were just reviewing.

20  Q.      And does that show the following too close?

21  A.      It shows the following too close as you have a

22  vehicle directly in front of one car -- you could

23  estimate one car length there.  I don't believe you'd be

24  able to fit two vehicles in that space, or it would be

25  very close.  So just over two vehicles, maybe.

1        MR. KIRK:  Your Honor, the government would

2   like to admit Government Exhibit 2.

3        THE COURT:  Any objection?

4        MR. MC CARTER:  No objection, Your Honor.

5        THE COURT:  Exhibit 2 will be marked and

6   admitted.

7        (Government's Exhibit 2 was received into

8         evidence.)

9   BY MR. KIRK:

10  Q.     All right.  With that, I'm going to let the

11  video play a few more minutes.  If you could just maybe

12  preview for the Court what we're about to see.

13  A.       Okay.  From this point on, you'll see the

14  vehicle continue to close its distance here.  I

15  will -- as soon as traffic is clear, I'll pull out and I

16  will make an attempt to catch up to the gray four-door

17  Chrysler.

18       (Video file played in open court.)

19  BY MR. KIRK:

20  Q.       Trooper Fletcher, I want to talk next about the

21  speeds at which you were traveling and which this car

22  was traveling.  Did you -- if you could describe to the

23  Court what it took for you to catch up to the defendant.

24  A.       So, when I pulled out, as I approached traffic,

25  you'll see me adjust my speed a little bit.  I slowed

1  down because I'm scanning to see -- you know, I work

2  this area quite frequently, and I have areas that I

3  typically like to stop a vehicle.  So I know generally

4  how long it takes me to catch up and observe the vehicle

5  and then perform a traffic stop.

6       I was -- I passed both the black Frontier and

7  the white Explorer relatively quickly in the right lane,

8  and it took me a little bit more time to catch up to the

9  gray Chrysler than usual, unless there was a speed, you

10  know, issue there.

11       So as I was able to get traffic -- once it

12  moved over and I have a visual on the Chrysler, I stayed

13  in the same lane and continued to follow it while

14  estimating the speed, looking at my patrol vehicle's

15  speed, and then also the front antenna displayed on the

16  dashboard.

17  Q.       So you have a -- essentially it's like a

18  heads-up display?

19  A.       That's right.

20  Q.       And that's telling you what?  Your radar

21  information along with your speedometer, that's within

22  your front field of vision?

23  A.       That's correct.

24  Q.       Do you recall roughly, to the best of your

25  memory, about how long you followed the defendant's

1  vehicle?

2  A.        It was a little more than two miles.  We passed

3  the Exit 62 just a few seconds ago in the video.  So

4  we're just beyond a little more than two miles.

5  Q.        Were you pacing this vehicle?

6  A.        When I was in the left lane and finally had him

7  in my sight directly in front of me, that's when I began

8  pacing the vehicle.

9  Q.        Can you talk the Court through that process

10  when you began pacing and then pacing him when you were

11  satisfied that you were -- had a speeding violation?

12  A.        Right.  So the first thing is about your visual

13  estimation.  So the Highway Patrol teaches to give a

14  visual estimation to say, "I believe the car is

15  traveling at this speed."  Also, I was using the

16  commercial vehicle in the right lane that he continued

17  to gain on as we're traveling.

18        So I get a visual estimation.  I then check my

19  speedometer of my patrol vehicle, and then I look at

20  the -- what's going to be displayed on my front-facing

21  antenna, and these speeds were 79 miles an hour.  At

22  times it was a little higher, and at times, I think the

23  lowest, it was 74, but it was a more consistent 79 miles

24  an hour.

25  Q.        And over what time and distance did you

1    continue this pacing?

2    A.        So the Highway Patrol wants us to pursue a

3    mile, roughly.  Three-tenths of a mile is what we would

4    consider the minimum.  So I was -- I was close to -- I

5    was more close to a mile than to three-tenths --

6    Q.        Okay.

7    A.        -- upon visually inspecting the vehicle.

8    Q.        And then we think from the time you pulled out

9    until the time you pulled over, you traveled a little

10   over two miles; did I understand that correct?

11   A.        That's correct.

12   Q.        Did the Tennessee Highway Patrol and do you

13   during the course of your training maintain any kind of

14   certificates regarding your radar certification or

15   calibration?

16   A.        Yes.  Every year when we're recertified, we

17   have documentation of that.  Plus, we carry a card that

18   tells our dates.  And then every two years when we get

19   calibrated, there is a laminated piece that is attached

20   to our radar unit.

21   Q.        All right.  I pulled up Government Exhibit 3,

22   and this is three pages, and I'm just going to go

23   through them slowly one at a time.  If you could look at

24   them on the screen.

25   A.        Yes, sir.

1          (Government's Exhibit 3 was marked for

2              identification.)

3  BY MR. KIRK:

4  Q.       Okay.  What are those three documents?

5  A.       They're the three documents I just described.

6  The one is for the unit itself.  And then this one

7  (indicating) is for me saying that I've yearly completed

8  my in-service for radar training.

9  Q.       And those are maintained and kept in the

10 ordinary course of business for the Tennessee Highway

11 Patrol?

12 A.       That's correct.

13         MR. KIRK:  Your Honor, with that, the

14 government would like to move Government Exhibit 3 into

15 evidence.

16         THE COURT:  Any objection?

17         MR. MC CARTER:  No objection, Your Honor.

18         THE COURT:  Exhibit 3 will be marked and

19 received.

20         (Government's Exhibit 3 was received into

21          evidence.)

22 BY MR. KIRK:

23 Q.       So on July 2nd, 2019, the date of this stop,

24 you were trained and certified to THP standards --

25 A.       That's correct.

1  Q.        -- on your radar equipment?

2  A.        Yes, sir.

3  Q.        Okay.  I next want to talk about the initiation

4  of the traffic stop.  And let's just preview again for

5  the Court.  What is it you're trained to do once a

6  traffic stop has been initiated?  Your patrol vehicle

7  and the defendant's vehicle come to a stop.  What are

8  you trained to do?

9  A.        You know, in my training, it would be to first

10  observe the vehicle once I initiate my traffic lights,

11  my blue lights.  One thing that the defendant did was he

12  dramatically increased -- or decreased his speed.  Like,

13  at one point, I'm on my brakes trying to stay -- you

14  know, not get too close to him.  So I'm observing what

15  the response to my traffic lights are, as well as what

16  the response inside of the vehicle is.

17  Q.        And once you approach a vehicle, what are some

18  of the steps you go through?

19  A.        We'll approach -- we tend to approach on the

20  passenger side for safety, but also it gives us a full

21  view of the vehicle and the occupants inside.  So we

22  just -- you know, and once we approach, we introduce

23  ourselves and advise as to what the reason for the

24  traffic stop is.

25  Q.        Okay.  I'm going to let this play for several

1    minutes and then I'll pause it.

2    A.         Okay.

3              (Video file played in open court.)

4    BY MR. KIRK:

5    Q.         Okay.  Let's talk about just that initial

6    minute or so right there at the defendant's passenger

7    side window.  Tell us about just the approach and things

8    you observed as you approached that passenger window.

9    A.         Just prior to approaching the passenger window,

10   I remained in my vehicle for just a minute.  I notice he

11   didn't put the car in park.  You can see the reverse

12   lights when he actually puts it in park.  So I'm just

13   sitting stationary for just a second to watch the inside

14   of the vehicle.

15             I notice him all the way over towards the

16   passenger side.  Sometimes that can indicate someone

17   getting paperwork out of the vehicle.  You know, so we

18   watch that to make sure it's not a lengthy amount of

19   time or a lot more movement than we're used to seeing.

20             The defendant stayed over there quite a while

21   and moved a couple of, you know, times.  So it just kind

22   of heightens your senses to make sure nothing else is

23   going on.

24             Once he put the car in park and moved back to

25   the driver's seat, that's when I approached, and as he

1 rolled down the window, that's when I begin my

2 interaction with him.

3       And it was at that time when he rolled down the

4 window and I began to introduce myself, I could smell a

5 strong odor of marijuana coming out of the vehicle right

6 there upon -- or the interaction with the defendant.

7 Q.      Okay.  Let's talk about this odor of marijuana

8 you detected.

9 A.      Yes.

10 Q.      To the best of your ability -- and this is a

11 little bit of a subjective question, but can you

12 describe the potency of that odor?

13 A.      It's very strong, and it's a very specific

14 odor.  We run into this odor quite frequently,

15 especially on the interstates.  It -- I describe it as

16 an undeniable odor.  It just -- it just -- and this was

17 a raw -- there is a difference in the raw odor and then

18 a smoked odor.  This, to me, was a raw odor, given my

19 experience, you know, with both versions of the odor.

20 Q.      Okay.  Let's talk a little bit about your

21 experience and the frequency of it.

22 A.      Yes, sir.

23 Q.      If you could describe for the Court your

24 experience with, I guess, marijuana in general and how

25 you know what it smells like.

1  A.        Right.  Throughout my law enforcement career, I

2  have been very specific in the interdiction part, as

3  well as, you know, the all-crimes approach.  So a lot of

4  the vehicles that we were stopping, it is becoming

5  increasingly common to interact with vehicles that have

6  the odor present.  It is a daily occurrence that we're

7  running into.

8            And, you know, we get the smoked where they

9  left somewhere and it's just the odor left over, but

10 then we also have where it's in the vehicle or currently

11 being used.  It's very common.

12 Q.        Can you, to the best of your ability, describe

13 maybe the difference between that smoked smell versus

14 the raw smell of marijuana.

15 A.        The best way I could describe is the -- it is

16 the odor of a smoked cigarette.  First of all,

17 it's -- I'm trying to think of a -- you have that

18 element of burnt.  You know, there is still that raw

19 side of it, but it's got the element of the fire

20 involved, if that makes any sense.

21 Q.        Sure, it does.

22            And you said you see it almost daily.  If you

23 could maybe describe for the Court what you're seeing

24 daily, just in your experience as a highway patrolman.

25 A.        You know, we're running into -- obviously we're

1  situated between some states that have legal marijuana,
2  and then we also have people coming through our state,
3  going to and from legal states and such.  And we also
4  have people going to and from those legal states to
5  illegal states, you know, states where it's not
6  currently legal.  And we run into all different types of
7  users, misdemeanor personal use, all the way up to
8  hundreds of pounds.  So, again, it is in a high number
9  of vehicles daily.

10          And so most often we'll run into a situation
11 where you have the odor, whether it's burnt or raw.  We
12 find it to be not as much as of a consequence to the
13 general motoring public as it once was.  So there is
14 a -- more of an option for people to be honest.  "Hey, I
15 have this amount," or, "I just smoked," or, "I had it in
16 here earlier," those types of things.  So it's more
17 common that people will -- when we advise them of the
18 odor, they will say, "Yeah, I've got it," or, "I've had
19 it."
20 Q.       I notice you asked the defendant out of his
21 vehicle and you performed a fairly quick pat-down.  Why
22 did you do that?
23 A.       Given the movement inside the vehicle and the
24 immediate odor, when I pulled him out, I could do a
25 visual inspection of him.  His clothing -- you know, it

1  was relatively easy to see, and that's why I made it so

2  brief.

3          And when I instructed him that I wanted to pat

4  him down, he made a motion with his hands to let me know

5  that that was okay.  So I did, like I said, just a brief

6  pat, back and front, just to make sure there wasn't

7  anything there that would hurt me or become an issue at

8  a later time.  So --

9  Q.       And you just made a movement with your hand.  I

10  just want to describe it for the court reporter.  You

11  had your hand held flat --

12  A.       Flat.

13  Q.       -- as if you're giving a high five and you were

14  just doing an up-and-down movement with your hand; is

15  that correct?

16  A.       Correct.  And then when we go across the belt

17  line, we use the backside of our hand just to make sure

18  there is nothing concealed in the waistband.

19  Q.       Okay.  Let's let this play out.  I believe you

20  and the defendant sit in the front seat of your vehicle

21  for a few minutes and interact; is that correct?

22  A.       That's correct.

23  Q.       So I'm just going to let this play for a few

24  more minutes.

25          (Video file played in open court.)

1  BY MR. KIRK:

2  Q.       Okay.  Trooper Fletcher, you just interacted

3  there and said you could smell it on him.  Can you

4  describe that for the Court, what you smelled while

5  you're in your patrol car?

6  A.       Well, the vehicle had such a strong odor, when

7  he came back to sit in my vehicle, it just came with

8  him, you know, in the clothing, and he didn't have any

9  on his person, but he was sitting in an area where there

10  was an odor.

11  Q.       Okay.  And we just heard you say that it's

12  loud.

13  A.       Right.

14  Q.       Were you referring to the odor of marijuana?

15  A.       That's correct, yeah.

16  Q.       What were you doing at this point?  I see

17  you're -- it's kind of hard to see on the video, but

18  you're interacting with your car's equipment.  If you

19  could describe for the Court, what are some of the steps

20  you're going through?

21  A.       Yeah.  We have a mobile CAD system where we

22  enter in information that's given to us, whether it's

23  through the driver's license or whatever the defendant

24  gives us.  We enter it into the system and it does a

25  check of if the license is valid or not, and then it

1  confirms address, car make and model, things like that.

2  So that's what I'm doing where my hands are actually on

3  my keyboard there.

4  Q.      All right.  And the registration for this

5  vehicle, obviously, did you determine this was a rental

6  vehicle?

7  A.      That's correct.

8  Q.      Do you also check criminal history warrants,

9  background, that kind of thing?

10  A.      Not criminal history, but we do check warrants.

11  And the only history we'll get is a driving history.  We

12  have to physically request a criminal history.

13  Q.      Okay.  Are you familiar, as a law enforcement

14  officer, familiar with the concept, the legal concept of

15  probable cause?

16  A.      I am, sir.

17  Q.      Do you receive training on what probable cause

18  is?

19  A.      Yes, sir.

20  Q.      And do you require probable cause to search a

21  vehicle?

22  A.      That's correct.

23  Q.      Okay.  Did the odor of marijuana at this point,

24  and at this point as we're looking in the video, did you

25  have probable cause to search the defendant's vehicle?

1    A.      I did.

2    Q.      What are some of the next steps you're going to

3    go through as we look at this moment in time in

4    Exhibit 1 that you're going to go through?

5    A.      Well, I pretty quickly sent a text to my

6    partner, you know, "Hey" -- it's just called 1038.  It

7    just means need backup.  So I sent a 1038 to my partner

8    who was north of me on 75.  I think he was completing a

9    traffic stop.

10   Q.      Okay.  And just real quick.  You made a thumb

11   motion.  Are you referring to with your hand that you're

12   sending a text message?

13   A.      That's correct.  We're given a state-issued

14   phone through the Highway Patrol, and that's what

15   we -- sometimes we'll call it out over the radio.  Other

16   times, whenever there is situations where the emotions

17   seem to be rising, we don't necessarily want to key up

18   and say, "Hey," you know, "come to me," or, you know,

19   whatever.  Sometimes that can heighten the emotions of

20   the situation.  So I just sent my partner a quick text.

21   Q.      Okay.  All right.  And if you could just maybe

22   preview, if you could, what's going to happen next in

23   the video.  Are you going to wait on your partner?

24   A.      Yes, I'm waiting on -- so I've texted him.

25   He's responded.  And then I just asked him, you know, to

1   step it up; to come on to me as quickly as he can.

2           One of the reasons for the request to go ahead

3   and come on is:  We kind of briefly talked about how

4   common marijuana is and how common the odor.  You know,

5   so we run into it quite frequently, and generally people

6   are forthcoming with it.  They will say, "Hey, I have a

7   misdemeanor amount in the center console," or they will

8   sometimes even hand you the amount or they will tell you

9   where it's at.

10          It's very rare that we have someone say you

11  don't smell it, or even go so far as to say that you're

12  lying.  And so this was an immediate indicator to me

13  that there is maybe something more going on than

14  what -- a simple violation, a misdemeanor violation.

15  You know, so that's why.

16  Q.      When you say "misdemeanor violation," are you

17  really referring to more, like, the amount of marijuana?

18  A.      That's correct, yes.  Oftentimes when it is a

19  misdemeanor amount or a personal use amount, again, with

20  the current thoughts on legalization or not, whatever,

21  it has just been more widely accepted that they're going

22  to let us know.  "Hey, I do have it.  You do smell it."

23  It's rare that we get told, "You don't smell it," you

24  know, if it's actually there.

25          So when he told me that, that was just an

1    indication that it may not just be a misdemeanor amount

2    or that he had recently been around it or something.  It

3    even further cued my suspicion that maybe something more

4    was going on, more activity.

5           So I requested the help of my partner, and

6    during this time, I'm continuing to look up some things

7    and just talk to him and just gage his level of emotions

8    based on the questions that I'm asking, both

9    consequential questions and then questions that don't

10   elicit such a high emotional response.

11   Q.      And let me ask you:  Before I play the video

12   again, let's talk a little bit about the policies and

13   procedures of the Highway Patrol --

14   A.      Yes, sir.

15   Q.      -- on searching a vehicle.

16   A.      Yes, sir.

17   Q.      If you could talk the Court through that.  Is

18   it your common practice to ask for a partner to come to

19   a scene to help search a vehicle on the side of an

20   interstate?

21   A.      There are very few situations where we're

22   allowed to search by ourselves.  One of those would

23   be in a probable cause situation where we could remove

24   the -- or put the victim -- or the defendant in the back

25   of our patrol car where they're secured.

1    So this wouldn't have risen to that level.  The
2  exception for me would be the area that we're at, there
3  is a field to our right.  His emotions, his breathing
4  has changed, the heightening of his tone of voice, like,
5  it's went up as opposed to being calm.  So these
6  factors, I didn't want to give him the opportunity to
7  step out of my vehicle while I'm on the interstate side
8  and either, you know, run or get back in his car.

9    You know, I don't know that he's going to do
10  that.  These are just signs that I'm seeing.  So I know
11  that it's better for me to wait for my partner, which
12  the Highway Patrol does have a policy that we're
13  supposed to have two, unless -- just very few
14  situations.  So --

15  Q.    All right.  I'm going to hit play, and we'll
16  let this play until a fellow trooper arrives.

17  A.    Okay.

18  Q.    And which trooper is it that shows up?

19  A.    Trooper Andrew Connors.

20    (Video file played in open court.)

21  BY MR. KIRK:

22  Q.    Okay.  Was that Trooper Connors that just got
23  to your driver's side window?

24  A.    Yeah, the sirens that passed, that was him
25  trying to get to an exit to come back to me.  So that

1  was Trooper Connors right there (indicating).

2  Q.        Okay.  If you can, tell us what are the next

3  steps that you and Trooper Connors are going to go

4  through.

5  A.        Trooper Connors came to my driver's side and I

6  was wanting him to be on the passenger side.  I didn't

7  want to get out and tell -- you know, we had -- that we

8  had an opportunity, you know, to be there with him.

9          And when Trooper Connors comes up to open the

10 door, I let Connors know, "Please watch him.  Don't let

11 him get out," you know, because just to our right is a

12 field and then there is a wood line, and we've had some

13 incidences on 75 in that specific area, and it creates a

14 long issue, you know, with people fleeing into the wood

15 line.

16 Q.        Okay.

17 A.        So Trooper Connors come up.  Our goal is to

18 have him sit in the rear of my vehicle.  And before we

19 do that, we actually do a proper pat-down, crush feel,

20 to make sure there is nothing that they could either

21 ingest or hurt themselves with when we put them back

22 there while they're unattended while we're at the

23 vehicle.  So that's about what's going to happen.

24 Q.        So when somebody is sitting in the back of your

25 vehicle, are they essentially detained in the back?

1   A.        Yeah.   At this point, we're not going to put

2   him in handcuffs.   We're just going to make sure he

3   doesn't have anything on him that would hurt him.   And

4   then we'll put him in the rear seat, which, you know,

5   it's video in case he has an emergency or anything like

6   that, and then we'll -- we'll start -- basically we want

7   them secured while our backs are to them while we're

8   searching.

9   Q.        Okay.   And just maybe as a preview to the

10  Court, does a scuffle essentially ensue?

11  A.        It does.

12  Q.        And maybe to just warn the Court and those in

13  the gallery that there is quite a good bit of explicit

14  language in this next segment.

15            Okay.   With that, I'm going to let this -- let

16  this play out.

17  A.        Yes, sir.

18            (Video file played in open court.)

19  BY MR. KIRK:

20  Q.        Okay.   You're holding something up right there

21  (indicating).   What is that?

22  A.        He ends up saying, "It's molly," but it's a

23  powder, or I believe it's a powder, like a pink-colored

24  powder in his little, small pocket.

25  Q.        When you say "little, small pocket," are you

1  referring to his shorts or pants?

2  A.        The jean shorts he had on.  There is a big

3  pocket, and then there is that little -- little-sized

4  pocket above it, and that's where that was.

5  Q.        Is that suspected narcotics?

6  A.        It is.

7            (Video file played in open court.)

8  BY MR. KIRK:

9  Q.        Okay.  Trooper Fletcher, that last little

10 interaction between you and Trooper Connors, what was

11 that that you said to him and what did he reply with?

12 A.        I was asking him if he could smell the odor of

13 marijuana.

14 Q.        And what did he say?

15 A.        "Oh, God, yeah," or, "Oh, yeah."

16 Q.        All right.  I next want to bring up Exhibit 4.

17            (Government's Exhibit 4 was marked for

18             identification.)

19 BY MR. KIRK:

20 Q.        Okay.  Exhibit 4 is a photograph.  Do you

21 recognize this photograph?

22 A.        Yes, sir.

23 Q.        And either did you or another trooper take this

24 photograph?

25 A.        I believe this is from my state cellphone.  So

1  one of us took the picture.

2  Q.       Okay.  Are these the -- is this the hood of

3  your patrol vehicle that we're looking at, the

4  background?

5  A.       That's correct.

6  Q.       And has this photograph been substantially

7  altered in any way?

8  A.       No.

9  Q.       And was it captured on July 2nd, 2019?

10  A.       Yes, sir.

11         MR. KIRK:  With that, Your Honor, the

12  government would like to admit Exhibit No. 4 into

13  evidence.

14         THE COURT:  Any objection?

15         MR. MC CARTER:  No objection, Your Honor.

16         THE COURT:  Exhibit 4 will be marked and

17  received.

18         (Government's Exhibit 4 was received into

19          evidence.)

20  BY MR. KIRK:

21  Q.       All right.  If you could, are these all the

22  items except for -- I guess we saw the cash and that one

23  baggy from the defendant's pocket.  But other than those

24  two items that we already saw in Exhibit 1, did the

25  remainder of these items come from the defendant's car?

1  A.       They did.

2  Q.       And let's just talk about a couple of these at

3  a time.  First let's just talk about the firearms.  This

4  handgun that I've circled in red (indicating), where was

5  that found?

6  A.       It was in the front passenger seat inside of a

7  backpack which contained personal information from the

8  defendant.

9  Q.       What about this other firearm (indicating),

10 the -- is that a Draco?  Or not a Draco.

11          THE COURT:  He already testified all this came

12 from the vehicle; correct?

13          MR. KIRK:  That's correct, Your Honor.  I'll

14 move on, Your Honor.

15 BY MR. KIRK:

16 Q.       These suspected narcotics, do you recall

17 roughly what they were, to the best of your memory?

18 A.       Well, we -- the yellow appeared to be like a

19 Xanax pill or possibly a pressed pill.  We didn't have

20 any way to test it on the roadside.  There are a couple

21 of baggies around it that are suspected heroin.  The

22 small bag in the top right -- or, yeah, the top right in

23 another -- that one was marijuana.

24 Q.       I'm sorry.  You just indicated this one right

25 here with the pink arrow (indicating)?

1   A.        That's correct.  That's the one that was in his

2   pocket.  That's what he considered to be "molly" or --

3   Q.        And then the last one?

4   A.        That's a bag of marijuana.

5   Q.        Okay.  I've pulled up a -- or the last exhibit,

6   which is Exhibit No. -- Government Exhibit No. 5.

7             (Government's Exhibit 5 was marked for

8              identification.)

9   BY MR. KIRK:

10  Q.        This is your THP report.  Do you complete a

11  report after every -- in the course of your duties?

12  A.        That's correct.

13  Q.        And did you complete this report on July 2nd,

14  2019?

15  A.        I report -- I completed a report for July 2nd.

16  It was probably a couple days after.

17  Q.        Okay.  But you complete those near in time to

18  the arrest; is that correct?

19  A.        Yeah, my signature shows that the report was

20  finally completed July 9th.  We have to submit the

21  report.  It gets approved and then sent back to us.

22  Q.        And that takes a couple of days?

23  A.        Yes.

24  Q.        And this is six pages.  I'm just going to

25  scroll through it shortly.  If you could just look at

1    each page.

2    A.        Okay.   This is just a cover sheet (indicating).

3    This is our crime report through the Titan database

4    (indicating).   That's where we enter in where the stop

5    occurred, times, and all the pertinent information.

6    Q.        And that's page 2 (indicating).   Let me scroll

7    to page 3.

8    A.        It's a continuation of the crime report, still

9    showing where it was at, what was found.

10   Q.        And this is page 4 (indicating).

11   A.        Continuation; shows more property.

12   Q.        Page 5 (indicating).

13   A.        This would be the information of the defendant,

14   along with the charges at the top.

15   Q.        And then, lastly, page 6 (indicating).

16   A.        A narrative to complete the crime report.

17   Q.        And do you complete the narrative portion?

18   A.        I do.

19   Q.        You wrote this portion?

20   A.        I did.

21   Q.        And these are kept in the ordinary course of

22   business with the Tennessee Highway Patrol?

23   A.        That's correct.

24   Q.        Does this appear to be altered in any way?

25   A.        It doesn't appear to be, no.

1    MR. KIRK:  With that, Your Honor, the

2  government would like to admit that as Government's

3  Exhibit 5.

4    THE COURT:  Any objection?

5    MR. MC CARTER:  No objection.

6    THE COURT:  Exhibit 5 will be marked and

7  received.

8    (Government's Exhibit 5 was received into

9     evidence.)

10  BY MR. KIRK:

11  Q.    Was the defendant then arrested and transported

12  to a detention facility?

13  A.    We had one of the local deputies transport him

14  to the Monroe County Sheriff's Department or the jail.

15    MR. KIRK:  Give me just one moment, Your Honor.

16    That's all the questions I have of Trooper

17  Fletcher.  Thank you.

18    THE WITNESS:  Thank you.

19    THE COURT:  Counsel?

20    MR. MC CARTER:  Thank you, Your Honor.

21          CROSS-EXAMINATION

22  BY MR. MC CARTER:

23  Q.    Trooper Fletcher, I don't believe we've met.

24  I'm Travis McCarter.  I'm the attorney for Mr. Brown.

25  A.    Nice to meet you.

1  Q.       I appreciate your patience as I ask you a few

2  questions.

3  A.       Yes, sir.

4  Q.       Going back to the actual traffic stop itself, I

5  know you said you activated your radar targeting the

6  defendant's vehicle; is that correct?

7  A.       My radar was activated, correct.

8  Q.       Can you describe for me how your radar's

9  targeting process works?  Can you select a specific

10 target, or does it go out in a cone?

11 A.       It goes out in a cone.

12 Q.       Okay.  Do you know how your radar picks which

13 object it's going to measure, as far as the cone that's

14 in front of it?

15 A.       I know how it's displayed.  I don't know the

16 inner workings of the radar itself.

17 Q.       Do you know what the maximum range of your

18 radar is?

19 A.       Not right off, no, sir.

20 Q.       Do you know how far you were from the

21 defendant's vehicle when you activated that radar?

22 A.       It varied.  I was -- you know, I don't know the

23 exact, no, sir.

24 Q.       Okay.  Did you have any information about the

25 defendant before you initiated the stop?

1  A.       No, sir.

2  Q.       Okay.  You didn't have any reason to suspect

3  him of drug activity at the time you initiated the

4  traffic stop; is that correct?

5  A.       No, sir.

6  Q.       And when you effected the stop of the

7  defendant, once he saw your lights turn on, he did pull

8  over and stop; is that correct?

9  A.       That's correct.

10 Q.       He complied with your signal to pull over to

11 the side of the roadway?

12 A.       That's correct.

13 Q.       And you approached his vehicle from the

14 passenger side, and you say that whenever he rolled his

15 window down, that's when you could first smell

16 marijuana?

17 A.       That's correct.

18 Q.       And I believe in your report you described it

19 as an overwhelming odor of marijuana; is that correct?

20 A.       Yes, sir.

21 Q.       Is it fair to say that at that time that you

22 would have formed the intent to search the defendant's

23 vehicle?

24 A.       No, sir.

25 Q.       Okay.  When did you form the intent to search

1  the defendant's vehicle?

2  A.       I believe it was on the video.  It was at some

3  point when he was in my vehicle.

4  Q.       So is it your testimony that the odor that's

5  coming from the defendant's vehicle was not enough by

6  itself to give you probable cause to conduct a search?

7  A.       It is enough, yes, sir.

8  Q.       Why would you not have formed the intent to

9  search that vehicle at the time you detected that

10  overwhelming odor?

11  A.       I don't want to take the stop to a heightened

12  level until I'm prepared to.

13  Q.       What occurred between the time you stopped the

14  defendant and ordered him into your vehicle and the time

15  that you formed the intent to search that made you want

16  to take it to that heightened level?

17  A.       We were in a controlled environment at that

18  point.  He was in an environment with me where it was

19  limited to where it could go.

20       So, as you've seen, we just had conversations

21  inside my vehicle.  So it further allowed me to keep the

22  emotional stress to continue to reach a level that it

23  ultimately did once we were back outside of the vehicle.

24  Q.       Now, you -- did you review your full video from

25  your vehicle before you came in today?

1  A.      I have seen the -- I don't know that I've seen

2  it from initiation to completion, but I've seen a great

3  majority of the video.

4  Q.      Have you reviewed the video from Trooper

5  Connors' vehicle?

6  A.      No, sir.

7  Q.      Do you recall texting Trooper Connors and

8  telling him that the defendant was flipping out in your

9  vehicle?

10 A.      I'm sure I did.

11 Q.      Okay.  What behavior did you just see from the

12 defendant on video that we just watched that you would

13 describe as "flipping out"?

14 A.      Well, first of all, he began having shallow,

15 fast breaths, which is an indication for me that his

16 emotional level is rising.  I also observed his body

17 movements.  He began using his hands exaggerated to

18 explain things, where when he originally got in my car,

19 monotone voice, sitting still, not having any emotional

20 issues, you know, because there wasn't a high

21 consequence because I hadn't revealed anything to him

22 yet.

23         To the untrained eye, these things may seem

24 insignificant, but having worked that specific stretch

25 of road for a couple years now, this was immediate

1   indicators to me that there was more of a consequence

2   than, you know, either just an odor or maybe a

3   misdemeanor amount.  And then my suspicion further arose

4   when he denied that there was an odor at all.

5   Q.      So I know you watched the video just like I

6   did, and at some point after he gets in your car -- it's

7   about a minute after he gets in the vehicle, you tell

8   him that everything is good with his license; is that

9   correct?

10  A.      That's correct, yeah.

11  Q.      And whenever you pulled him over, you had told

12  him that you intended to check if his license was good

13  and you were going to give him a warning for the two

14  moving violations and let him go.  So at the point that

15  you had ran his license and everything came back good --

16  A.      I mentioned that I would -- that was my

17  intention.  I didn't say I was going to.

18  Q.      Between the time that you pulled him over and

19  the time you ran his license and told him everything

20  came back good, what changed?

21  A.      Well, that -- it wasn't that time frame that

22  anything changed.  When it changes is when I first

23  approached the vehicle and smelled the odor of

24  marijuana.  But I did not let him know that because I'm

25  not ready to.  I will let him know whenever I'm in a

1  situation that -- or my goal is to avoid any -- any

2  extreme emotional situation.

3          You know, I had the probable cause to search

4  the vehicle at that time, but had I revealed it to him,

5  you know, there is any number of things that could have

6  happened.  You know, they didn't happen, but they could,

7  and I've got to be aware of those situations.

8  Q.      And you had mentioned in your testimony that --

9  what you called a probable cause situation, where you

10  can put the defendant in the back of a vehicle and

11  perform a search by yourself?

12  A.      Is that a question?

13  Q.      Do you recall testifying to that?

14  A.      I did.

15  Q.      That can arise?

16  A.      Yes, sir.

17  Q.      And that would be one of the limited situations

18  in which you can search by yourself and not call for

19  backup?

20  A.      Right.  I have the ability to make that

21  decision.

22  Q.      Why did you not make that decision in this case

23  if the smell was overwhelming coming from the

24  defendant's vehicle?

25  A.      Well, as I testified earlier, we're in a field

1  that goes into a wood line where we've had many

2  incidences.  We have several outstanding incidences

3  currently where people have taken off into the wood line

4  or escaped in some way.

5        So -- so I didn't want -- I'm on the driver's

6  side; he's on the passenger side.  You know, normally

7  I'd say, "Sir, if you don't mind to step out, I'll meet

8  you at the front of the vehicle.  We'll do a pat-down

9  and we'll get you on your way as soon as we complete

10 this," and that usually is what happens.

11       In this scenario, leading up to that point, I

12 had seen such an increased emotional situation, I didn't

13 want to take that chance.

14 Q.      Okay.  You said that is usually what happens is

15 that that's the protocol you follow.  Is this a standard

16 investigative technique you use on traffic stops is to

17 have the defendant come back and sit in the front of

18 your vehicle?

19 A.      Yeah.  Unless they refuse to, yes.

20 Q.      Okay.  And Mr. Brown did not refuse to --

21 A.      No, sir.

22 Q.      -- is that correct?

23 A.      Yes.

24 Q.      In fact, he was compliant throughout the

25 entirety of the stop until Trooper Connors arrives; is

1   that fair to say?

2   A.          Thankfully, yes, sir.

3   Q.          Okay.  Why did you not make the decision to put

4   Mr. Brown in the back of your vehicle where you wouldn't

5   have to have the concern about him escaping or running?

6   A.          Because as part of an investigation, what I

7   want to determine, or I hope to determine, is the level

8   of criminal activity that may be going on.  If it is a

9   simple interaction with the motoring public who may have

10  been around or had a small amount of marijuana through a

11  quick -- while I'm running my checks, performing my

12  wants and warrants, and completing my warning, these

13  are -- this is an opportunity for me to gage the level

14  of criminal activity.

15          So, there again, we've kind of moved away from

16  immediately telling someone that's still in a vehicle,

17  that is a potential danger to us outside of the vehicle,

18  "Hey, I smell the odor of marijuana.  Get out.  I'm

19  searching your car."  We've seen that that can elevate

20  the emotion of a situation if the consequences are high,

21  and we don't know what the consequences are until we

22  have a brief interaction.

23  Q.          Is it fair to say you did not have the intent

24  to search Mr. Brown's vehicle when you first asked him

25  to sit in your front seat of your car?

1    A.       I'm sorry?  Could you repeat that?

2    Q.       Is it fair to say you had not formed the intent

3    to search Mr. Brown's vehicle when you ordered him to

4    sit in the front seat of your car?

5    A.       I was going to search his car as soon as I

6    made -- had the odor of marijuana.

7    Q.       Okay.

8    A.       Which was right when I made my approach and he

9    rolled the window down.

10   Q.       So at the time that you made the initial

11   approach of the vehicle, you decided at that time you

12   were going to search his vehicle?

13   A.       I had the probable cause to search his vehicle

14   and I was going to, yes, sir.

15   Q.       But in spite of having that probable cause, you

16   put him in the front of your vehicle instead of the

17   backseat?

18   A.       That's typically -- I just explained why I did

19   that, yes, sir.

20   Q.       Well, I know typically you do.  But why -- if

21   you already had the probable cause, why would you not

22   put him in the backseat if you know you're going to have

23   to put him there eventually anyways?

24   A.       I just explained.  I'm reading the situation to

25   find out what level of criminal activity may be afoot.

1  You know, sometimes it's very minimal; sometimes it's a
2  high consequence.

3          In my training and experience, the interview,
4  while I'm completing my law enforcement duties, does
5  show that there is a lot more -- yes, I could have
6  searched the vehicle immediately.  That's not how we are
7  trained.  That's not how we perform -- or, you know, I
8  didn't take him straight to the back of my vehicle.
9  One, I was by myself.  And I'm familiar with that area,
10 and if I get in a struggle or if he runs, you know,
11 that's a potential issue.

12         So we're always learning from these stops and
13 trying to do the -- you know, what's best for our
14 safety, their safety, and if it turns into some kind of
15 criminal case, you know, that this is -- the goal is to
16 get as much information as possible in a short amount of
17 time.

18 Q.      So essentially what you're telling me is that
19 you put him in the front of your vehicle so you could
20 get more information from him before you searched the
21 vehicle?

22 A.      While doing my law enforcement duties, which I
23 do on every stop.

24 Q.      Did you give him any kind of *Miranda* warning
25 before you started asking questions in the vehicle?

1  A.      No, sir.

2  Q.      Would you agree with me that once he sat in the

3  front of your vehicle that he was not free to leave your

4  vehicle?

5  A.      Well, he wasn't free to leave once I initiated

6  my emergency equipment.

7  Q.      And, in fact, he asked you to retrieve his

8  phone, and you told him to stay right there; right?

9  A.      Yeah.

10  Q.      To not leave the car?

11  A.      Yeah.

12  Q.      Would you agree with me that he was in custody

13  when you're asking him these questions?

14  A.      He was not in custody until -- we were going to

15  put him in the backseat of our car during the search

16  without handcuffs.  We didn't have -- we had probable

17  cause to search.  We didn't -- he wasn't under arrest

18  for anything.  So he was not in custody.  He was

19  detained during the traffic stop, which all motor, you

20  know, vehicle occupants are.

21  Q.      What sort of policies or procedures does your

22  department have for when or when not to use a canine

23  unit to sniff a vehicle?

24  A.      Well, in this particular instance, marijuana

25  was an odor.  You know, it is up to the officer who

1  makes the traffic stop.  So in cases of marijuana -- and

2  also the THP doesn't train their dogs in the odor of

3  marijuana anymore.  This particular dog was certified in

4  marijuana that day.

5          But we typically -- if it's an overwhelming

6  odor like that, we are moving towards the ultimate

7  search of the vehicle based on that odor.

8  Q.      Do you recall having a conversation with

9  Trooper Connors at the scene where you all discussed

10 that you wished you had let the dog sniff the vehicle

11 before?

12 A.      That was in reference to the other narcotics

13 present.  That would have been a good note for the dog.

14 Yes, sir, we did have that conversation.

15 Q.      And then Trooper Connors said he was going to

16 put it on the dog sheet anyway; right?

17 A.      He ultimately ran the dog.  He ran the dog to

18 give it that -- to see if it would alert.  He did, and

19 he notated that.  That's pretty common.

20 Q.      Is it common to take drugs out of a vehicle and

21 then place them back in for the purposes of training a

22 dog on a crime scene?

23 A.      I'm not a canine officer, and I've never done

24 that personally.

25 Q.      And obviously you're aware that Trooper Connors

1  did take some narcotics and put them back in the car?

2  A.        I wasn't aware until the Motion to Suppress.  I

3  wasn't aware of that until then.  I thought that I had

4  left that amount in the vehicle from the original stop.

5  I thought I just missed a certain amount.

6  Q.        You weren't aware that Trooper Connors took

7  those and put them back in the vehicle?

8  A.        Not until I read it.

9  Q.        Okay.

10 A.        Yeah.

11           MR. MC CARTER:  We'll pull up the video.

12           If you'll give me just a second, Your Honor,

13 we'll load that.  This is from Trooper Fletcher's

14 dashboard camera.

15           MR. GREEN:  If the audio is off, Your Honor,

16 we'll adjust it.

17           (Video file played in open court.)

18 BY MR. MC CARTER:

19 Q.        You all appear to be having a conversation

20 here; is that correct?

21 A.        That's correct.

22 Q.        Do you recall what the substance of this

23 conversation was?

24 A.        I mean, I don't.  I'd have to really study it.

25           (Video file played in open court.)

1  BY THE WITNESS:

2  A.        It appears we may be trying to approximate how

3  much is in each bag.

4  BY MR. MC CARTER:

5  Q.        I know you say Trooper Connors appears to be

6  placing the drugs back into the car.

7  A.        I see it now, yes, sir.

8  Q.        But you're telling me that at the time that

9  this happened, right after this conversation you all

10 had, you are not aware that he had done that?

11 A.        I mean, I'm not even looking at him.

12 I'm -- yeah.  What my testimony is, is:  I didn't know

13 that we had left anything in the vehicle.  I thought I

14 missed the amount that was in the car that was later

15 found at the rental company.  So this whole time I

16 thought I just missed a certain amount.  But it turns

17 out it was placed back in there for the canine.

18 Q.        In fact, after Trooper Connors had the canine

19 come over and alert on these narcotics, he left them in

20 the car and the car was taken off; is that correct?

21 A.        Well, it looks like he at least got the one bag

22 because the only thing that was recovered in the vehicle

23 was a smaller bag.  Because it looks like he had more

24 than just -- so maybe he recovered, you know, a portion

25 of what he put in there to run the dog and didn't get

1  the rest of it.  I can only assume because, like I say,

2  I'm not even paying attention to what he's doing.

3  Q.      Did it concern you at all that he was taking

4  the narcotics and putting them back in the car in an

5  area where they weren't found initially?

6  A.      Well, again, I'm not a canine officer, and he's

7  a sworn trooper with -- I mean, I've worked with Trooper

8  Connors for a couple years and never had a single issue

9  with him.  So it did not concern me at all.

10          (Video file played in open court.)

11          MR. MC CARTER:  Stop it there (indicating).

12  BY MR. MC CARTER:

13  Q.      Why did you make the decision if you had the

14  canine on scene not to let it sniff the car before you

15  searched it?

16  A.      With the overwhelming odor, I generally don't.

17  I -- actually, most of my career, I've not had access to

18  a canine.  This -- this was my first partner in my whole

19  career with a canine.  So it just wasn't customary for

20  me to rely on a canine.  It was consent or probable

21  cause.

22  Q.      And you would agree with me you didn't have

23  consent in this case?

24  A.      That's correct.

25  Q.      And you relied on the probable cause of the

1  odor of marijuana as your basis for the search?

2  A.       Yeah, not only in the vehicle itself, but in

3  mine.  Once the defendant was in mine, it was very

4  obvious.

5  Q.       Now, would you agree with me that when the

6  defendant was in your vehicle, he was polite and

7  responsive to your questions?

8  A.       Yes, sir.

9  Q.       He wasn't combative or trying to physically

10  assault you in any way; is that correct?

11  A.       That's the very reason we did the interview the

12  way we did, yes, sir.

13  Q.       Okay.  Do you recall telling the Monroe County

14  Sheriff's deputies when they showed up on scene that the

15  defendant had been combative the whole time?

16  A.       I don't recall that.  If it's on the video,

17  then I must have said it.

18  Q.       If you said he was combative the whole time,

19  that would be an inaccurate statement?

20  A.       It would be an inaccurate statement as far as

21  the word "combative," yes, sir.  That would have been

22  directly following an incident where we, you know, had

23  an issue.  So --

24  Q.       In looking at the crime report that the

25  government submitted as Exhibit No. 4, I see that you

1  made a statement in your narrative that, "Once Trooper

2  Connors arrived, I asked the defendant to step out of my

3  vehicle for a more thorough frisk before we were to

4  place him in the back of my patrol car during the

5  search."  Does that seem accurate as to what you put in

6  your narrative?

7  A.       Well, it's essentially, maybe, like, a runon

8  sentence.  I'm stating what was to happen.  I didn't

9  mean that I told the defendant that's what I was going

10 to do.  I was stating for the narrative, at this time,

11 it was time to step out of the vehicle.  We always do a

12 thorough pat-down search of the person before they go

13 into the rear of the vehicle to make sure that -- it

14 was -- it was a statement of what was to happen, not

15 that I said it to the defendant.

16 Q.       But you did not ask the defendant to step out

17 of the vehicle, did you?  You just said, "Open that

18 door."  Is that fair?

19 A.       Probably.  Yeah, I think that's what it was,

20 yeah.

21 Q.       Okay.  And you didn't tell the defendant why he

22 was stepping out of the vehicle?

23 A.       Again, given what had led up to that point, no,

24 I wasn't ready to reveal -- not until we were, you know,

25 in good shape.

1   Q.      In watching the video that we just watched of

2   the arrest of the defendant, once Trooper Connors

3   arrived, is it fair to say the situation escalated

4   quickly?

5   A.      Well, that's when the consequence was the

6   closest, yes, sir.

7   Q.      Okay.  Did you see in that video that we just

8   watched the defendant take any step or make any motion

9   like he was going to attempt to run away at all?

10  A.      I did.

11  Q.      What did see on that video?

12  A.      I saw -- you know, Trooper Connors had a hold

13  of his belt line and was trying to maintain his hands on

14  top of his head so that he could do a search.  But given

15  the stance that the defendant was taking, how tense he

16  was, and the fact that he would momentarily do exactly

17  as we asked and then immediately break from it, these

18  are indicators of buying time to figure out what exactly

19  is going to happen.

20          You know, we've seen this where, "Am I going to

21  run?  Am I going to fight?  Am I going to do" -- you

22  know, so we're just -- honestly, that's why I stepped

23  back watching because I'm just waiting to see is he

24  going to comply, get into the back of the car, or is it

25  going to turn into another situation.

1    So I saw his right leg step back and I saw his
2 elbow come down.  To me, that looked like he was going
3 to roll to his right and either run or whatever.  That's
4 when Trooper Connors made the decision to just go to the
5 ground.
6 Q.    But up until that point the defendant had given
7 you no indication he was going to run or otherwise try
8 to escape the scene; is that correct?
9 A.    Well, he absolutely did.  Before I even got him
10 out of the vehicle, you see me point at him and say,
11 "Watch him."  So, yes, he gave me the indication from
12 the time the consequence was introduced until it
13 actually went to the ground, yes, I believe that he -- I
14 believe his consequence level was high.
15    He told me that there was no odor of marijuana,
16 which I knew to be inconsistent.  He called me a liar,
17 saying that there is no way I smelled it.  So these were
18 indicators that it was -- it was going to be a higher
19 emotion situation.
20 Q.    Well, given what was in the defendant's car
21 that he obviously, according to you, had knowledge of,
22 he would have known the consequence was high immediately
23 when he was stopped, would he not?
24 A.    Sure.  And his goal is to not let me know that.
25 Q.    And he was complying throughout the stop up

1  until the time that Trooper Connors arrived?

2  A.        We've established that he was compliant, yes,

3  sir.

4  Q.        Right.

5           When you placed the defendant in front of your

6  vehicle, did you lock the doors or leave the doors

7  unlocked?

8  A.        No, I made a statement later that I had locked

9  it, but I never did.  You can see on the video it

10  remains unlocked the entire time.

11  Q.        Okay.  And you made a statement that once you

12  locked the doors, he started wigging out; is that right?

13  A.        In my mind, I thought that I had locked it

14  because there was a timeframe that he was looking out

15  the window for an extended period of time.  I've seen

16  that very thing in my vehicle and the guy took off

17  running.

18           So, in my mind, I was thinking that I locked

19  it.  But I also -- I generally never lock my vehicle

20  when someone is in there.  And, you know, I typically

21  will let them know that we don't have to stay in the

22  vehicle if they don't -- in this situation that wouldn't

23  have been the case, but, no, I did not lock the door.  I

24  did make that statement, though.

25  Q.        And yourself and Trooper Connors both searched

1  the vehicle; is that correct?

2  A.        That's correct.

3  Q.        And you searched the passenger compartment, and

4  it looks to me like Trooper Connors searched the trunk.

5  A.        Yes, sir.  When I searched the passenger

6  compartment, I found the firearms and a bag of pills.

7  So I stayed with that while Trooper Connors continued

8  his search.  Ultimately we would have probably met at

9  the trunk, but I recovered some evidence immediately.

10  So --

11  Q.        Okay.  So is it fair to say there was no

12  marijuana in the passenger compartment of that vehicle

13  at all?

14  A.        In the front passenger compartment?  No, there

15  was not, no.

16  Q.        There was nothing in that front passenger

17  compartment that you found that would emit an odor of

18  marijuana?

19  A.        Well, the defendant did emit an odor of

20  marijuana.  And then that particular bag, I don't know

21  if it smelled like it, but the one in the trunk smelled

22  like marijuana, just by itself.

23  Q.        Now, the only marijuana that was uncovered on

24  the scene was actually found in that bag that was in the

25  trunk; is that correct?

1   A.      In the trunk, that's correct.

2   Q.      Do you know, was that bag locked, closed,

3   zipped when it was first encountered by Trooper Connors?

4   A.      The backpack was zipped.

5   Q.      And how was -- the marijuana that was inside

6   that bag, how was it packaged?

7   A.      It was in, like, a Saran Wrap-type bag and tied

8   in a knot.

9   Q.      And was that bag located -- was it inside

10  another bag as well?

11  A.      It was inside the backpack.

12  Q.      Okay.  Do you know if that -- what you're

13  calling the Saran Wrap, or, I guess, what the drug was

14  actually packaged in was located inside the -- what we

15  call a black duffle bag or backpack, was there another

16  layer of packaging around that bag that all -- that

17  multiple baggies or packages of drugs were in as well

18  that had to be opened; are you aware of that?

19  A.      I don't believe so.  I think it was just in the

20  Saran Wrap-type with a knot on top.  As soon as we found

21  it, we began taking photos right in the back of the

22  trunk.  We -- you know, so --

23  Q.      Was the bag already opened?  The black duffle

24  bag, was it already opened when you first encountered

25  it?

1  A.      Yes.

2  Q.      And that was the only marijuana that was found

3  on the scene; is that correct?

4  A.      Yeah, I think it was over -- just over an

5  ounce.

6  Q.      In reviewing your video, did you happen to

7  notice that the audio on the video cuts off at

8  31 minutes and five seconds?

9  A.      Is it during interaction with another trooper

10 or --

11 Q.      It is.  It is.  It's during an interaction with

12 Monroe County and Trooper Connors as well when he

13 arrives.

14 A.      Yeah, our general rule allows us to discontinue

15 audio when speaking with other law enforcement.

16 Q.      So at the time the audio shuts off, that would

17 have been something you would have done?

18 A.      Yes.

19 Q.      Okay.  When we watched the video, we saw

20 Trooper Connors specifically holding the defendant's

21 head down on the hood of the vehicle.  Is that something

22 you all were trying to do is to hold the defendant down

23 on the hood of a vehicle like that?

24 A.      In a situation like that, you do the best you

25 can do to complete the search and arrest the subject.

1  So to say we've ever been trained to do that, I couldn't

2  testify to that, no.

3  Q.        Would you agree with the defendant's statement

4  that the hood was hot?

5  A.        Absolutely, yeah.

6  Q.        Okay.  And I noticed when the defendant was

7  taken down to the ground by Trooper Connors, he's told

8  to put his hand behind his back, and he says, "I can't."

9  Do you know why that would have been the case, why he

10 couldn't put his hand behind his back?

11 A.        Well, he had his right hand in his belt line,

12 and you hear me talking to Connors as I'm letting him

13 know, "Hey, this hand is free."  And then I think I made

14 a reference to the "I can't get the other one out of his

15 belt loop."

16         So when they -- when they went to the ground,

17 Connors' face was near his on the ground.  So Connors

18 really couldn't -- Trooper Connors couldn't see what I

19 could see.  And since he was the one engaged with the

20 defendant, I was trying to let the defendant know -- the

21 trooper know, hey, this is what's going on.  Like

22 either, you know, I see his hands or I don't, or how do

23 we get this completed in a way that gets

24 everything -- and just to clarify, are we talking about

25 when -- before he was in handcuffs or after?  I'm sorry.

1  Q.       It would have been before.

2  A.       Before.  So all of what I just stated was

3  accurate in reference to me trying to let Trooper

4  Connors know what was going on at the lower portion of

5  the body.  Because Trooper Connors' head was kind of in

6  the ground a little bit.  He was trying to hold his

7  weight but manipulate the defendant's hands.

8  Q.       Okay.

9  A.       At one point, they got -- Trooper Connors and

10  him ended up getting twisted up, and I even said -- I

11  said, "Hey, his hand is around yours," or "around the

12  cuff."  You know, so it was just an opportunity for me

13  to try to let Trooper Connors know exactly what was

14  going on so we could get this -- get the defendant under

15  arrest and then move forward.

16       MR. MC CARTER:  I believe that's everything I

17  have for this witness, Your Honor.  If you'll give me

18  just a second.

19       THE COURT:  Counsel, is this video we've just

20  viewed during your cross-examination, is it part of the

21  earlier admitted exhibit?

22       MR. MC CARTER:  I don't believe.  I think the

23  earlier-admitted exhibit would probably cut off before

24  this portion, Your Honor.  So we would move to admit a

25  copy of it, if there is no objection.

1          MR. KIRK:  I don't object to this portion of

2     the video.  I would probably have some argument about it

3     at the end of our hearing, but I don't object to the

4     admittance of it.

5          THE COURT:  Well, if it's possible, the Court

6     would like to have it marked as the next numbered

7     exhibit and received.

8          MR. MC CARTER:  Okay.  We'll do that, Your

9     Honor.

10          MR. KIRK:  And that would be Exhibit 6.  That

11     would be the next in order.

12          (Defendant's Exhibit 6 was marked and received

13           into evidence.)

14          THE COURT:  Anything else for this witness from

15     the government?

16          I'm sorry.  Are you finished, Counsel?

17          MR. MC CARTER:  I believe I am, Your Honor.

18          THE COURT:  Anything else for this witness from

19     the government?

20                    REDIRECT EXAMINATION

21     BY MR. KIRK:

22     Q.       Trooper Fletcher, this right here that's on the

23     screen (indicating) --

24          MR. KIRK:  If you could just -- I apologize,

25     Your Honor.

1  BY MR. KIRK:

2  Q.        -- this is well after the search of the

3  vehicle?

4  A.        Yes, sir.

5  Q.        In fact, in this -- and I'll refer to it as

6  Exhibit 6 -- we see the time marking.  It's in military

7  time, but T 23:27:45.  I guess that's Zulu time.

8  A.        Correct.

9  Q.        That's quite a ways after the search of the

10  car; is that correct?

11  A.        It is.

12  Q.        The running of the canine was purely for -- I

13  believe you testified earlier just for training purposes

14  for Trooper Connors' canine?

15  A.        That's correct.

16  Q.        Did it have anything at all to do with the

17  probable cause to search the defendant's car?

18  A.        No, sir, it did not.

19  Q.        And I want to just clarify some earlier

20  questions and then I'll be through, but defense counsel

21  asked you about the forming the intent to search.  At

22  what point in your mind -- and I want to make sure we

23  have this clear on the record -- did you determine that

24  you had probable cause to search the car?

25  A.        As soon as he rolled the window down and I made

1    my introduction.  So it was just a few seconds into my

2    approach.

3    Q.       And when we were talking about forming the

4    intent to search, are we talking about the intent to

5    communicate that to the defendant?  I just want to give

6    you a chance to clarify what you meant by "intent to

7    search."

8    A.       My intent to search for me, for my probable

9    cause, was nearly immediate.  I didn't let the defendant

10   know until I felt that it was a time to -- that the

11   situation was under control.

12            MR. KIRK:  That's all the questions I have,

13   Your Honor.  Thank you.

14            THE COURT:  Any recross based on the scope of

15   the redirect, Counsel?

16            MR. MC CARTER:  No, Your Honor.

17            THE COURT:  All right.  Thank you for your

18   testimony, sir.  You may step down.

19            THE WITNESS:  Thank you.

20            (Witness excused.)

21            THE COURT:  The government's next witness,

22   please.

23            MR. KIRK:  No further witnesses, Your Honor.

24            THE COURT:  Any witnesses from the defendant?

25            MR. MC CARTER:  No witnesses from the

1  defendant, Your Honor.

2          THE COURT:  All right.  I always ask counsel

3  after we've taken testimony on a suppression issue as to

4  whether counsel wants to have any time to file any

5  post-hearing memorandum with regard to law or evidence

6  that's been presented.  Is the government requesting?

7          MR. KIRK:  No, Your Honor.

8          THE COURT:  Is the defendant requesting?

9          MR. MC CARTER:  No, Your Honor.

10          THE COURT:  All right.  Does the government

11  want to make any additional argument in addition to

12  what's already been in the motion?

13          MR. KIRK:  No, Your Honor, just based on --

14          THE COURT:  I'm sorry.  I interrupted you,

15  Counsel.

16          The Court obviously has the motion, the

17  government's response, and the memorandum.  Do you want

18  to add anything to what has already been filed by the

19  government?

20          MR. KIRK:  No further factual argument as from

21  what Trooper Connors has presented.

22          THE COURT:  Could you come to the podium.  It

23  will help the court reporter.

24          MR. KIRK:  Yes, Your Honor.  I'm sorry.

25          No further facts, Your Honor.  Obviously the

 1   government would rely on the exhibits it's submitted to

 2   the Court and on Trooper Fletcher's testimony here

 3   today.

 4          And we'll also rely upon the legal arguments

 5   we've set forth in our response motion and the case law

 6   that the government has cited, that the odor of

 7   marijuana, in and of itself, that the Sixth Circuit has

 8   affirmed in numerous cases.

 9          THE COURT:  The defendant's motion raises as a

10   central part of the motion the credibility as to

11   testimony regarding the smell of marijuana emanating

12   from the vehicle, and I want to hear your side of the

13   issue as to how the Court should evaluate the

14   credibility as to the source or the strength of the

15   smell of marijuana, whether it was or was not at the

16   scene.

17          MR. KIRK:  The Court should evaluate, one,

18   Trooper Fletcher's testimony here today, and obviously

19   can evaluate and observe his credibility based on his

20   training and experience as a law enforcement officer and

21   what he's testified to today, as well as Government

22   Exhibit 1, which captured these moments in time on

23   July 2nd, 2019, as we saw.

24          As Trooper Fletcher interacted with the

25   defendant within his vehicle, he says, "Hey, it's loud.

1    I can smell it on you right now" in Trooper Fletcher's

2    car.

3            So the Court can evaluate those exhibits,

4    Exhibit 1, both on the approach to the defendant's car

5    and inside the defendant's -- inside Trooper Fletcher's

6    patrol car, as well as Trooper Fletcher's testimony here

7    today that there was, in fact, a strong odor of

8    marijuana.

9            And then additionally when Trooper Fletcher and

10   Trooper Connors approached the defendant's car, you hear

11   that almost spontaneous burst from Trooper Connors where

12   he says, "Oh, God, yeah," or words to that effect

13   regarding, "Hey, can you smell it," the question that

14   Trooper Fletcher asks Trooper Connors.

15           THE COURT:  What is the necessity, if there is

16   a necessity, for the Court to make a determination as to

17   the source of the odor of marijuana as testified to?

18           MR. KIRK:  If I understand the Court's

19   question, I think the Court can --

20           THE COURT:  In other words, what if the Court

21   has a factual situation where there is an odor but no

22   source?

23           MR. KIRK:  Well, the source may have been

24   removed from the vehicle and an odor can remain behind.

25           THE COURT:  In other words, I guess what I'm

```
1   asking you is:  As a legal matter, is the Court required
2   to identify a source --
3           MR. KIRK:  No, I don't --
4           THE COURT:  -- of the alleged odor?  Because I
5   believe part of the motion is to question the
6   credibility of the testimony based on the lack
7   of -- alleged lack of a source.
8           MR. KIRK:  Well, in this case, Your Honor,
9   there is a source, as we saw after the search was
10  completed.  There was a bag, as Trooper Fletcher
11  testified to, slightly over an ounce of marijuana in the
12  bag that has the knot tied on it.  I believe it was in
13  Exhibit 4.
14          THE COURT:  Is the government's argument in
15  this case that that's the source, a bag wrapped up in a
16  backpack in the trunk?
17          MR. KIRK:  No, the government's argument is
18  that it could be the source.  It could be the defendant
19  himself.  It could be the material within the car.  It
20  could be a combination of all of those things.
21          THE COURT:  Well, let's roll back to my
22  question then.  What, if any, is the Court's legal
23  obligation to identify a source?
24          MR. KIRK:  I don't think the Court is obligated
25  to identify a source, other than the Court can make the
```

1  factual determination that the car in itself had an

2  odor, a strong odor of marijuana, and that in and of

3  itself is enough to establish probable cause to search

4  the vehicle.

5        THE COURT:  I just wanted to make sure I

6  covered those areas of concern.

7        MR. KIRK:  Yes, Your Honor.

8        Your Honor, the only other thing I'd like to

9  point out is the Defense Exhibit 6 regarding the

10  training of the canine and the placing of narcotics

11  bears no relevance on the issue of whether or not this

12  evidence should be suppressed, given --

13        THE COURT:  I'm more concerned on that video.

14  And the reason I wanted to make it an exhibit, it

15  appeared -- although there was no testimony about this,

16  it appeared that -- it appeared that the troopers

17  satisfy themselves that the small bag of marijuana was,

18  indeed, marijuana by taking it off the trunk and

19  smelling it up close to their faces.  Did you see that?

20        MR. KIRK:  I did see it.

21        THE COURT:  And what is the Court to make of

22  the strength of the odor of the marijuana under those

23  circumstances?

24        MR. KIRK:  Well, I think, Your Honor, the Court

25  should first consider Trooper Fletcher's testimony and

1    his initial -- initial actions with the defendant, both

2    at the passenger side of the car and within Trooper

3    Fletcher's car where Trooper Fletcher explained to the

4    defendant, "I can smell the odor.  It's loud.  It's on

5    you and it wasn't in my car prior to you sitting in my

6    car."

7            THE COURT:  Is it relevant to the Court's

8    inquiry?

9            MR. KIRK:  The smelling of the bag of

10   marijuana?

11           THE COURT:  What the Court just observed on the

12   video in that regard.

13           MR. KIRK:  No, I do not think that's relevant.

14   That's after the search of the vehicle and after Trooper

15   Fletcher had obtained probable cause to search the

16   defendant's car.

17           Your Honor, with that, and given the

18   government's response motion, the government asks the

19   Court to deny the defense Motion to Suppress.  Thank

20   you.

21           THE COURT:  Thank you, sir.

22           Counsel.

23           MR. MC CARTER:  Your Honor, by way of closing,

24   I would just point out that a couple of the observations

25   the Court has made, I believe, are germane to our

argument. Not necessarily insomuch as the Court would

have to identify a source to evaluate whether or not

probable cause exists, but keeping in mind that it's the

government's burden to prove by a preponderance of the

evidence that there was probable cause for a warrantless

search.

The only witness they offered in that regard is

Trooper Fletcher, and I would submit to the Court that

his testimony has been inconsistent today. He testified

that he made inconsistent statements at the scene; that

he said he locked his doors when he didn't; told other

officers the defendant was combative when he wasn't;

stated that although he had probable cause to search the

vehicle immediately, he placed the defendant in the

front of his vehicle instead of the back, knowing he

would have to move him there later to search the car.

I do think it is of -- it's of note with regard

to the trooper's credibility. I'm sure the trooper is

aware that the odor of marijuana gives him probable

cause to search. Of that, I have no doubt. But I think

the lack of a source and what Your Honor observed is the

same thing I put in my motion, with the troopers lifting

the bag of marijuana to the nose to smell it to make

sure it's marijuana speaks that there really is no, you

know, pervasive, overwhelming odor of marijuana.

1      The reason they're sniffing that bag is to see

2 if it is, in fact, marijuana because there is no

3 pervasive odor on the scene.  Otherwise, they would know

4 that would have to be the source of the odor, given what

5 was found in the vehicle.

6      So even if -- the Court doesn't necessarily

7 have to find that there was a source for probable cause

8 to be formed.  I think the lack of a source, along with

9 the trooper's behavior, just speaks to a lack of

10 credibility on behalf of the witness, which is the only

11 witness the government offered, Your Honor.

12      So we would submit that the government has not

13 met its burden by proving by a preponderance of the

14 evidence that there was probable cause to search that

15 vehicle.

16      We would ask the Court to grant our motion and

17 to suppress all evidence that was found inside.

18      THE COURT:  All right.  Thank you, Counsel.

19      MR. MC CARTER:  Thank you, Your Honor.

20      THE COURT:  The government gets the last word

21 if you want it.  Counsel, anything else?

22      MR. KIRK:  Your Honor, the government would

23 just ask that the Court take a look at Exhibit 6 to see

24 which bags the troopers are, in fact, smelling.  I think

25 they were smelling some other bags, not necessarily the

1 marijuana bag.  But we would just ask the Court to

2 evaluate that evidence when it's evaluating and

3 preparing to make its ruling in this case.

4            But with that, Your Honor, we just rely on our

5 response motion and the argument today and ask that you

6 deny the defense motion.

7            THE COURT:  Thank you, Counsel.  Appreciate

8 your work today.  Well done.

9            Anything else that the Court needs to address

10 on this case today from the government's standpoint?

11            MR. KIRK:  No, Your Honor.  I don't believe so.

12 Thank you.

13            THE COURT:  Or the defendant?

14            MR. MC CARTER:  No, Your Honor.  Thank you.

15            THE COURT:  All right.  Madam Clerk.

16            THE COURTROOM DEPUTY:  All rise.

17            THE COURT:  We'll be in recess.

18            THE COURTROOM DEPUTY:  This honorable court

19 stands in recess.

20            (Which were all the proceedings had and

21             herein transcribed.)

22                    *  *  *  *  *  *  *

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4          I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported in machine shorthand the above

6    proceedings, that the said witness(es) was/were duly

7    sworn; that the foregoing pages were transcribed under

8    my personal supervision and constitute a true and

9    accurate record of the proceedings.

10          I further certify that I am not an attorney or

11   counsel of any of the parties, nor an employee or

12   relative of any attorney or counsel connected with the

13   action, nor financially interested in the action.

14          Transcript completed and signed on Friday,

15   February 7, 2022.

16

17

18

19

21          _____
             TERESA S. GRANDCHAMP, RMR, CRR
22           Official Court Reporter

23

24

25